## COLBY *vs.* JACKSON.

Selectmen and overseers of the poor have not, *ex officio,* any right to control and restrain the person of a lunatic.

If a person be so insane that it would be dangerous to suffer him to be at liberty, any person may, from the necessity of the case, without warrant, confine him for a reasonable time, until proper proceedings can be had for the appointment of a guardian. *See 108 Mass., 116.*

No one has a right to confine an insane person for an indefinite period, until he shall be restored to reason, but under the sanctions, and upon compliance with the formalities, of the law.

If it be dangerous to permit an insane person to be at liberty, and he be confined, and before measures can be taken for the appointment of a guardian, he become sane, and be released, the party confining him will not be a trespasser.

The plaintiff being insane, and it being dangerous to permit him to be at liberty, the defendant, one of the selectmen of the town, confined him. He then, with the other selectmen, applied to the judge of probate for an inquisition upon the plaintiff. A warrant was issued, and the selectmen made an inquisition, and declared their opinion to be, that the plaintiff was insane; but made no return of the inquisition to the judge of probate, and no further proceedings were had; but the defendant still kept him in confinement.—*Held,* that he was a trespasser *ab initio.*

In trespass for imprisoning the plaintiff, who was then insane, the defendant may show, in mitigation of damages, that he made inquiry, whether it would be safe to permit the plaintiff to be at liberty, and was told by the plaintiff's friends and neighbors, that it would not; and that he seemed desirous to take the best course for the plaintiff and his family.

TRESPASS, for an assault and battery, and false imprison-

ment.  At the trial, under the general issue, the plaintiff offered evidence tending to prove that the defendant imprisoned the plaintiff in a cage, and there detained him from the 1st day of January, 1840, to the 12th day of March, 1840.

The defendant pleaded the general issue, with a brief statement, that the plaintiff, at the time of the imprisonment, was insane, and that it was dangerous to permit him to be at large ; and that his own safety, and that of his family and the public, required his confinement—that the defendant was one of the selectmen and overseers of the poor for the town of Eaton, and was called upon to aid the plaintiff's family in supporting the plaintiff as a pauper, and did so—that, in confining the plaintiff, he did no more than was necessary to protect the family of the plaintiff from his violence, and to insure the comfort of the plaintiff ; and that whatever he did was in discharge of his duty as one of the overseers of the poor, and in conformity to the wishes of the family of the plaintiff.

It was admitted that the defendant was one of the selectmen of Eaton ; and it appeared in evidence, that in the month of November, 1839, the plaintiff's wife sent a message to the selectmen, informing them that the plaintiff was insane, and that she feared for her life, and desired assistance—that she was afraid to live with him, but had no other home.  She did not complain that the plaintiff did not provide suitable necessaries for his family, but only that he would not suffer her to have her clothes.

The defendant also offered evidence tending to prove that the plaintiff, at the time of his confinement, was so insane that it was dangerous to himself and his family to permit him to go at large.  It was proved that the selectmen applied to the court of probate for an inquisition to be held on the plaintiff, and that on the 14th day of December, 1839, a warrant was issued to them, directing them to make inquisition, and return the result thereof to the probate court.  The selectmen summoned the plaintiff before them, examined

witnesses, and declared their opinion to be that the plaintiff was insane, but made no return of their doings to the court of probate, and no farther proceedings were had in the matter.

In order to show that he acted with the assent of the plaintiff's family, the defendant offered the deposition of Colman Colby, who testified that "the selectmen inquired of the friends and some of the neighbors who were present, if they were willing, or thought it would be safe, for my father to come home, and have his liberty as usual ; and it was my opinion, and the unanimous opinion of those present, that it would not be safe. It was then proposed to build a cage, with joists and poles, in one of the rooms in my father's house, and confine him in it. Three of my brothers were there, and assisted in making the cage. The selectmen appeared desirous to take the best course for my father and the family."

The court ruled, that if it were not dangerous to permit the plaintiff to go at large, the assent of the family would be immaterial, but permitted the deposition to be read in mitigation of damages. To the admission of the evidence the plaintiff objected.

The court instructed the jury, that the burthen was upon the defendant to prove that the plaintiff was insane, and that it was dangerous to suffer him to be at large—that if the plaintiff were so insane that it was dangerous to himself and others to permit him to be at liberty, the defendant might confine him until application could be made to the proper authority, and a guardian appointed—that such an application must be made in a reasonable time—that the defendant had no right to confine him for an indefinite time, as long as he should think proper, without making any application for, and procuring the appointment of, a guardian, even if he were dangerous ; and that if he were dangerous when confined, and were restored to reason before the defendant could take measures to have a guardian appointed, the defendant would not be liable.

Colby *v.* Jackson.

The defendant moved the court to instruct the jury, that if they should find that the plaintiff was insane, and that it was dangerous to suffer him to be at large, the defendant might lawfully confine him, so long as he should remain in that situation ; but the court declined so to instruct the jury.

The jury returned a verdict for the plaintiff, for one dollar damages, which the plaintiff moved to set aside, on account of the admission of the deposition of Colman Colby ; and which the defendant moved to set aside, on account of the instructions of the court, and the omission by the court to instruct the jury, according to the motion.

*J. P. Hale, & Hall*, for the plaintiff.

*J. Eastman, & Hobbs*, for the defendant.

GILCHRIST, J.    The defendant in this case had not, by virtue of his office as one of the selectmen and overseers of the poor, the right to exercise any constraint or control over the person of the plaintiff.    Selectmen and overseers of the poor are not, *ex officio*, guardians of insane persons, and have no greater authority to interfere with, and control their actions, than is possessed by the rest of the community.    The plaintiff was not a pauper, nor in danger of becoming one, nor is the defendant's right to interfere based upon the ground that the plaintiff was supported by the town of Eaton.    If a relative or friend of a lunatic, or the overseers of the poor, apply to the judge of probate for the appointment of a guardian, the judge is to cause the selectmen to make inquisition thereinto ; and if, upon the return of the inquisition, and due examination, it shall be decreed by the judge that the person is a lunatic, he may appoint a guardian. *N. H. Laws* 339, (*Ed. of* 1830.)   The overseers of the poor may make an application, and the selectmen, when required, may make an inquisition, and here their duties end.   They have no power to imprison the alleged lunatic, or to control his move-

ments, in any manner, beyond that possessed by private persons.

But it is well settled at common law, that a private person, without warrant, may lawfully seize and detain another, in certain cases. It will be a justification of a battery, if a man hold another to restrain him from mischief. *Com. Dig.*, *Battery, H.* If two persons be fighting, and there be reason to fear that one of them will be killed by the other, it will be lawful to part and imprison them till their anger shall be cooled. *Bac. Abr., Trespass, D. ; 2 Roll. Abr.* 559. It is lawful for every man to lay hands upon another, to preserve public decorum; as, to turn him out of church, and prevent him from disturbing the congregation, or a funeral ceremony. *Glever* vs. *Hynde,* 1 *Mod.* 168 ; *Hall* vs. *Plumer,* 1 *Lev.* 196. So, if a person intend doing a right act, as to assist a drunken man, or prevent him from going along the street without help, and a hurt should ensue, he would not be answerable. *Bull. N. P.* 16. And private persons may justify breaking and entering the plaintiff's house, and imprisoning his person, to prevent him from murdering his wife. *Handcock* vs. *Baker,* 2 *B. & P.* 260. Other instances might be given, but these sufficiently illustrate the application of the principle.

Upon these authorities, and upon the obvious necessity of the case, if no authorities could be found, the original restraint of the plaintiff by the defendant was justifiable. There was evidence that the plaintiff, at the time of his confinement, was so insane that it would have been dangerous to himself and his family to permit him to be at large. If it be lawful " to lay lands upon another," to preserve public decorum ; to imprison persons till their anger shall be cooled, lest they should kill each other ; to break into a man's house and imprison him, lest he should murder his wife—it was certainly lawful for the defendant to imprison the plaintiff, whose state of mind was such as to expose himself and those dependent upon him, to physical suffering, and perhaps to

death.    To do this, he needed no warrant ; his duty as a citizen called on him to interfere in a case of such extreme urgency.    But when the immediate safety of the lunatic and his family had been cared for, the duty and right of interference by the defendant ended.    Defective as our laws have been, in omitting to provide for the moral and intellectual treatment of the insane, our lawgivers have not neglected to entrust the guardianship of the lunatic, upon proper application, to some person who shall be responsible for the due discharge of his duty, and who shall be directly answerable, in his official capacity, to a competent tribunal, for any breach of his official trust.    It is the duty of the guardian to take care both of the person and estate of his ward, "and in all things to use his endeavors that his ward shall suffer no injustice ;" and he is to give bond, with condition, for the faithful discharge of his trust.    Thus the law throws around the lunatic the safeguards of legal proceedings, and responsible protectors, who are to dispose of his person with a consciousness of their accountability to the court, for the propriety of their conduct.    The defendant was not bound to wait until any legal formalities should have been complied with ; for, as we have remarked, the urgency of the case called for his immediate intervention.    Lord Eldon, in giving the reasons for the judgment in the case of *Handcock* vs. *Baker*, before cited, says that a wife, in danger of being murdered by her husband, is bound to apply for the remedies provided by law, (i. e. articles of the peace, &c.) only " where it is probable that the injury to be apprehended will be prevented by such application."    We allow the defendant the full benefit of this principle.    But it was peculiarly his duty to see that the judge was furnished with the proper evidence to authorize him to appoint a guardian.    The case finds that, on the application of the selectmen, a warrant was issued by the judge of probate, directing them to make inquisition into the state of the plaintiff, and return it to the court.    They summoned the plaintiff before them, examined witnesses,

and declared their opinion to be that the plaintiff was insane, but made no return of their doings to the judge, and no farther proceedings were had. No reason is given for this culpable omission of duty. The bare opinion of the selectmen that the plaintiff was insane, certainly did not justify his farther detention. They had no authority in the matter, of themselves; and their opinion, not returned to the judge of probate, is the opinion of three private persons, and it is nothing more. Fortified by their private judgment, the defendant, it seems, was willing to incur the risk and expense of legal proceedings against him; and what was done in the matter was undoubtedly considered by the jury as evidence that his conduct had not been wanton and malicious. But he contends that the court should have instructed the jury, that if they should find that the plaintiff was insane, and that it was dangerous to suffer him to be at large, the defendant had a right to confine him so long as he should continue thus insane and dangerous. But such an authority is possessed by no person, unless under the sanctions, and after compliance with the forms, of law. No relationship, however near; no ties of friendship, however close, between the lunatic and his keeper, would render the existence of such a rule consistent with the safety of the community. Every cage would be a licensed private mad-house; and, added to the nameless and unimaginable horrors which have been brought to light in such establishments in England, even under the treatment of medical men, and regulated by acts of parliament,* would be the further evil, that each individual keeper would be irresponsible. Any citizen could confine his neighbor, provided only he were insane; and if the confinement were to continue as long as the insanity, both would probably end only with the life of the patient; imprisonment in a cage not being supposed to be the most efficacious mode of restoring an insane man to his reason. The existence of such an authority would perhaps comport with

---

* Edinburgh Review, vol. 28, p. 432–474.

the spirit of the vagrant act, 17 *Geo. II.*, *c.*5, §§ 20, 21, which authorizes justices of the peace to confine lunatics " of the poorer sort, who wander about to the danger and dismay of the king's subjects," and which is " a good justification for confining, binding, and *beating* the unhappy man, in such manner as is proper and requisite in those circumstances." 1 *Wooddes,* § 245 : The *quantum* of beating which is proper for " the unhappy man," being, of course, in the discretion of his keeper. But the existence of such laws has passed away with the narrow views which produced them ; and the improved knowledge of the present day, on the subject of mental alienation, would not tolerate a course of treatment which was once deemed not only judicious, but a measure of absolute necessity. It has been impressively and eloquently said, that every man is interested in this subject ; for no man can reckon on the continuance of his perfect reason. Disease may weaken, accident may disturb, anxiety may impair it ; and if every departure from sound mind may subject the person so affected to an indiscriminate treatment, including deprivation of property and liberty, no man can be sure that he may not, with a full consciousness of his suffering and wrongs, be one day treated as if all sense and feeling in him were destroyed and lost ; torn from his family, from his home, from his innocent but eccentric pursuits, and condemned, for an indefinite period, to pass his melancholy days among the idiotic and the mad. *Conolly's Indications of Insanity, page* 8.

We think, therefore, that the instructions of the court were correct ; that the defendant was justified, by the necessity of the case, in restraining the plaintiff for a reasonable time, until an application could be made to the court of probate, and a guardian appointed ; and that he had no right to imprison him for an indefinite period, without taking any farther measures. The right to imprison the plaintiff was an authority given by law. As soon as the defendant, by abandoning the legal proceedings which had been commenced,

and still continuing the imprisonment, asserted the right of a confinement of indefinite duration, he abused his authority and became a trespasser *ab initio.* His motion for a new trial must, therefore, be overruled.

But the plaintiff has also moved for a new trial, on account of the evidence admitted by the court in mitigation of damages. This evidence tended to prove that the defendant did not proceed wantonly and inconsiderately; that the selectmen inquired of the friends whether it would be safe for the plaintiff to be at large, and were told that it would not be safe, and that they appeared desirous to take the best course for the plaintiff and his family. The defendant having committed an unlawful act, may surely be permitted to prove that his intentions were good; that he was actuated by no ill will against the plaintiff, and that his demeanor was that of a person who meant to do a kindness rather than a wrong. If an act be in itself unlawful, and the party do not justify nor excuse it, the law will imply a criminal intent. *Rex* vs. *Woodfall,* 5 *Burr.* 2667; *Rex* vs. *Topham,* 4 *T. R.* 127. And an unlawful act, done wilfully and purposely, to the injury of another, is, as against that person, malicious. Shaw, C. J., *Commonwealth* vs. *Snelling,* 15 *Pick.* 340. But if the defence fall short of a legal justification or excuse, it may still show facts which prove the absence of any malicious intent. And it has been held that, in actions for false imprisonment, the jury are to look to all the circumstances attending the imprisonment, and not merely to the time for which the party was imprisoned, and give damages accordingly; and all the circumstances are admissible which accompany and give a character to the trespass. *Bracegirdle* vs. *Orford,* 2 *M. & S.* 77. So either party may, with a view to the damages, give evidence to prove or to disprove the existence of a malicious motive in the mind of the publisher of defamatory matter. *Pearson* vs. *Lemaitre,* 5 *Mann. & Gr.* 700. And for trespass and entry into the plaintiff's house, the jury may consider, not only the mere pecuniary

damages sustained by the plaintiff, but also the intention with which the act was done ; whether for insult or injury. *Sears* vs. *Lyons*, 2 *Stark. Rep.* 317.

If the jury are to consider all the circumstances attending the transaction, evidence of those circumstances, and of the conduct and demeanor of the actors therein, is admissible. If his acts indicated the existence of right rather than of wrong motives ; if he behaved with the caution and kindness of a man disposed to respect the rights of others, the defendant was surely entitled to lay evidence to that effect before the jury ; to urge upon them that this was not a case for exemplary damages, and to convince them, that although his conduct might have been illegal, it was not prompted by improper motives. We think that the plaintiff's motion must also be overruled, and that there should be

*Judgment on the verdict.*