(No. 16947.—Reversed and remanded.)
SELMA CRAWFORD, Plaintiff in Error, *vs.* SANGER BROWN *et al.* Defendants in Error.

*Opinion filed April 23, 1926—Rehearing denied June 3, 1926.*

1. INSANE PERSONS—*party cannot be committed to institution for insane without a judgment.* The statute in regard to lunatics does not authorize members of the family, doctors or nurses to commit a person to an institution for the insane without the authority of a judgment of court, and it authorizes only a temporary detention, when necessary, pending an investigation.

2. SAME—*when a temporary detention without a judgment is authorized.* Imprisonment or detention of a person without an adjudication is under the statute limited to ten days, and is authorized only where the person is actually insane and his condition is such that restraint is necessary for his protection or the protection of others from his violence; and the parties applying the temporary restraint must act upon facts and not upon suspicion or belief and must take the responsibility for an error of judgment.

3. SAME—*when detention is not shown to have been authorized.* The mere fact that a wife, who had been caring for her husband during an illness of typhoid fever, suffers a nervous collapse does not authorize the doctor and nurse who are attending the husband to give her morphine and take her to a sanitarium used mostly for people of unsound mind, even though her son and daughter consent to such action; and her forcible detention in such institution

321—20

for two weeks without the authority of a judgment of court is an unlawful restraint of her liberty, even though the doctor and nurse testify that her presence at home was detrimental to her husband's recovery.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. JAMES S. BALDWIN, Judge, presiding.

CHARLES P. R. MACAULAY, for plaintiff in error.

FREDERIC A. BROWN, GEORGE P. MERRICK, and CLINTON MERRICK, for defendants in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

Selma Crawford (hereafter referred to as plaintiff) sued Dr. Sanger Brown and Ada Crawford (referred to herein as defendants) for damages for unlawfully restraining her liberty and detaining her in prison. The declaration charged defendants assaulted, beat, ill-treated and unlawfully detained plaintiff in prison for fifteen days, contrary to the laws of Illinois. Defendants filed pleas of not guilty and notices that they would prove special defenses. The special defense Dr. Brown gave notice he would prove was, that plaintiff was restrained in the Kenilworth Sanitarium, owned and conducted by him, while she was of unsound mind and in great danger of injuring herself and attendants, and that she was received at the asylum upon the written request of her son and daughter, and that only such restraint was exercised as was necessary for her welfare. The special defense proposed to be proved by Ada Crawford was, that plaintiff, while of unsound mind, was sent to the sanitarium by her son and daughter for treatment; that it was to plaintiff's best interest and that of her husband, who was ill with typhoid fever, that she be taken to the sanitarium for treatment, and that whatever restraint was placed upon her was incidental to her

welfare and to the preservation of her husband's health; that the arrangements for taking plaintiff to the sanitarium were made by her son and daughter and by Dr. Schwartz, who was the physician of plaintiff's husband; that all medicine and treatment given plaintiff by Ada Crawford was given under the direction of Dr. Schwartz. The jury, after hearing the evidence and instructions, returned a verdict of not guilty. The court overruled plaintiff's motion for a new trial and rendered judgment upon the verdict. A writ of error has been sued out of this court to review the judgment.

The plaintiff contends the court erred in refusing to direct a verdict for her, as requested; that the verdict was contrary to the evidence; that the court erred in admitting improper evidence, giving erroneous instructions for defendants and refusing correct instructions asked by the plaintiff, and in permitting the jury to take with them to the jury room certain exhibits introduced in evidence by the defendants.

The ground upon which it is contended this court has jurisdiction to entertain the appeal is, that the trial court misconstrued the State and Federal constitutions in instructions that an insane person may be committed without process of law.

Dr. Brown owned and conducted, under a State license, the Kenilworth Sanitarium,—an institution where patients, principally of unsound mind, are treated. Doctors and nurses are employed in the institution. Plaintiff is a married woman and lived in an apartment with her husband, a grown son and daughter. Plaintiff's husband in November, 1915, had typhoid fever, and she nursed him about ten days and then secured defendant Ada Crawford, a trained nurse, to take charge of nursing the patient. After the nurse came plaintiff had a collapse or fainting spell, and November 19 she was forcibly given morphine by the nurse, strapped to a stretcher, placed in an ambulance and taken

to the sanitarium. The proof shows arrangements had been made for the ambulance to be sent to plaintiff's residence to take her to the sanitarium, and the morphine was forcibly given plaintiff to render her quiet during the trip to the sanitarium. A drug clerk helped Ada Crawford give the morphine. After being taken to the sanitarium, and after the effects of the drug had passed, plaintiff learned where she was and demanded to be taken to her home, but in defiance of her repeated protests she was not permitted to return home for two weeks. Plaintiff had never been adjudged insane or of unsound mind by any court and her detention in the sanitarium was not by the judgment of a court.

There is no contention that plaintiff was ever mentally unbalanced prior to the time her husband had typhoid fever. She nursed him before they secured a trained nurse, and her duties and the strain affected her nervous system. She testified the nurse administered to her drugs for a week before she was taken to the sanitarium. The nurse testified plaintiff would go to her husband's room to visit him, run her fingers through his hair and annoy him and cause his temperature to increase. The nurse testified plaintiff was a nervous woman, which was increased by worry about her husband, and on one occasion before she was sent to the sanitarium the nurse found her in semi-conscious condition, partly on a chair and partly on the floor. She testified plaintiff did not completely rally before she was sent to the sanitarium, and the doctor and the family advised that arrangements be made to take her to Dr. Brown's sanitarium. The nurse denied she had previously administered drugs to quiet her, but that the doctor directed she give her a hypodermic of morphine about a half hour before she started on the trip to the sanitarium. Plaintiff was accompanied there by the nurse, who did not go in the sanitarium but returned to plaintiff's husband. Plaintiff testified she was beaten and ill-treated at the sanitarium, but this was

denied by the nurses and employees at that institution. When received there she was under the influence of drugs, was quiet, and was placed in a department where the quiet patients were kept. When she came out from under the influence of the drug, the doctors and nurses at the sanitarium testified, she became much excited and demanded that she be allowed to return home, and she was removed to a department where the more excitable and noisy patients were cared for. The proof abundantly shows the plaintiff was forcibly detained in the sanitarium for about two weeks before she was permitted to leave.

The arrangements for taking plaintiff to the sanitarium were made by plaintiff's son and daughter and by Dr. Schwartz. After plaintiff was taken to the sanitarium, Dr. Brown testified, he communicated with her son and daughter and sent them a contract to sign. It was signed by them, and provided they should pay the sanitarium $65 per week, and recited that it was understood by them that plaintiff was of unsound mind and required restraint for proper care and treatment, and authorized the sanitarium, its officers and employees to exercise such restraint as might be necessary, and agreed to hold the sanitarium, its officers and employees harmless from all suits brought by plaintiff or anyone in her behalf. The defense of justification relied upon is embodied in an instruction given to the jury for defendants, which is as follows:

"The court instructs you that not every restraint of a person is illegal, and if you believe from the evidence that the plaintiff, by reason of disease or her mental condition, was incapable of subjecting her actions to the control of reason, and if you further believe from the evidence that in her then condition she might have injured herself or others, then it was lawful for her family, or those who were responsible for her, to restrain her of her liberty for a reasonable time for the purpose of treatment. This they

could do in her own home or by sending her to an institution where she could receive such treatment."

Section 1 of the act in relation to the commitment and detention of lunatics provides that the word "insane" shall be construed to mean any person who by reason of unsoundness of mind is incapable of managing and caring for his own estate, or is dangerous to himself or others if permitted to go at large, or is in such condition of mind or body as to be a fit subject for care and treatment in a hospital or asylum for the insane. But no person idiot from birth or who is afflicted with simple epilepsy shall be regarded as insane unless manifestations of abnormal excitability, violence or homicidal or suicidal impulses are such as to render confinement in a hospital or asylum for the insane a proper precaution to prevent him from injuring himself or others. Section 2 provides that no insane person or person supposed to be insane, who shall not have been legally adjudged to be insane, shall by reason of his insanity or supposed insanity be restrained of his liberty, provided that the section shall not be construed to forbid temporary detention of an alleged lunatic for a reasonable time, not exceeding ten days, pending a judicial investigation of his mental condition. The act prescribes the procedure for obtaining legal authority to restrain insane persons, and provides penalties for their detention contrary to the provisions of the act.

We do not agree that the instruction quoted correctly states the law, but even if it did, the facts proved did not bring the case within the rule. The proof did not show plaintiff was insane or that her mental condition was such as to require her to be placed under restraint to prevent her from injuring herself or others. Before she was removed to the sanitarium she had nursed her husband about ten days. The strain told on her nerves, and she was no doubt somewhat more excitable than under normal conditions. After Ada Crawford took charge of nursing the husband

plaintiff would occasionally go to his room to see him, and the nurse claimed the visits were injurious to the patient. The nurse said plaintiff did the cooking, with the help of her daughter in the evening; that one evening plaintiff had a nervous collapse. The daughter, Ruth, was in the room with plaintiff at the time, and she says her mother fainted. The nurse and daughter put her in bed. This was five days before she was removed to the sanitarium, and Ada Crawford testified she never completely rallied before she was removed. Plaintiff testified the nurse gave her drugs hypodermically and in her cocoa. The nurse denied she ever gave plaintiff drugs in her cocoa, and never but one time hypodermically, and that was when she was removed to the sanitarium. Plaintiff expressed the belief that the nurse and the doctor who was treating her husband were carrying on a flirtation, and that drugs were administered to her to keep her out of the way. This the nurse denied. She did not say plaintiff was insane, but that she was very nervous and insisted on visiting her husband and preparing his meals. She did not eat or rest well and was not improving, and for those reasons the family, the nurse and the doctor decided to send her to the sanitarium.

Dr. Hoag testified he was called to see plaintiff on November 19 at her home. She was in bed, was in a nervous condition, and said the nurse and the doctor who was treating her husband had drugged her. His advice was that plaintiff or her husband should be taken from the house so that both could be better cared for. He next saw her at the sanitarium, when called there by Dr. Brown. She was in an excited condition, wept, and begged to be taken away. She complained of violence from the nurses there. She was bordering on hysteria, but appeared to understand him and not to have any hallucinations.

Dr. Sherman Brown, nephew of Dr. Sanger Brown and employed at the sanitarium, testified plaintiff received the treatment there the case demanded; that she needed rest

and food. He at first had doubts about whether she would survive or not. She was nervous, excitable and scolded anyone who approached her.

Dr. Margaret Grant, employed at the sanitarium, testified when plaintiff was brought there she seemed slightly disturbed. At first she was relatively quiet but gradually became more disturbed and had to be restrained from injuring herself or the attendants. She was given the necessary restraint. The treatment was kind but firm. She was always dissatisfied and thought she ought not to be there. Her one thought was to get away. She resented any implication that she was insane.

Dr. Sanger Brown testified he was not present when plaintiff was admitted to the sanitarium. He saw her two or three days afterwards, in the department where the more excitable patients were kept. She talked in an excited manner and felt outraged at having been brought there and demanded that she be allowed to go home. He concluded she had had a mental breakdown and the family could not get along with her. He would not have allowed the exercise of any restraint if the family had not given consent. He said force had to be used to prevent plaintiff leaving the sanitarium. The doctor received letters from the daughter, which he introduced in evidence. In the letter from the daughter to Dr. Brown enclosing the contract signed by herself and brother, she expressed the hope that it would not be shown to her mother, because, she said, "I really do not feel that her mind is unsound. This is simply the result of a year of wretched health, which has caused her to magnify trivial things and allow them to worry her until they have overbalanced her reasoning power." He considered plaintiff of unsound mind.

Some nurses in the sanitarium testified to the condition of plaintiff while there and the treatment she received. All denied treating her with violence, but said she was resistant, talked excitedly, wanted to be taken home, and she had

to be dealt with firmly. She threatened to "go after" the people responsible for sending and keeping her there. There is some uncertainty about plaintiff having been put in a "camisole." She testified she was. None of the nurses who testified admitted knowing anything about it. One of them testified the highly excited patients were put in a camisole, but she did not know how often one was used on plaintiff.

We are convinced from the proof that plaintiff was at no time insane or dangerous to herself or others. She was worried about her husband's illness and nursed him herself until a trained nurse was employed. She did not approve all the conduct and actions of the nurse, and evidently refused to leave her sick husband entirely to the care of the nurse and refrain from going in his room to see him. To our minds plaintiff's attitude toward the nurse was not unnatural for a wife, but the nurse appears to have wanted her removed,—not because she was insane and threatened violence toward anyone in the family or herself, but because she thought her presence in the house was objectionable under the circumstances. Dr. Hoag seems to have agreed with the nurse, and arrangements were made with the sanitarium to take her there after morphine had been forcibly administered to her. It is not a matter for surprise that when she found where she was she begged to be allowed to go home and became excited when she was forcibly detained in the institution, which Dr. Brown testified was "mainly for people of unsound mind." One does not have to draw heavily on the imagination to imagine the horrors of such a situation to one who is not insane. Our statute does not authorize members of the family, doctors and nurses to commit a person to an institution for the insane without the authority of a judgment of court. Temporary detention or restraint of an alleged lunatic is permitted for not exceeding ten days, pending a judicial investigation, when the safety of the patient or others requires it.

The instruction referred to, which the court gave at the request of defendants, was not warranted by the statute or the evidence.

In *Maxwell* v. *Maxwell,* (Iowa) 10 A. L. R. 482, a father seventy-eight years old was at the instance of his son taken into custody by the sheriff and against the father's will transferred to and left in the Soldier's Home, where he could remain or leave. The father remained there a few days and then returned home and sued the son for false imprisonment. The son urged in justification that his father was insane and that his restraint was necessary to protect him from himself and to protect the public, and that he acted in good faith for the best interests of his father and the public. The court said: "If the plaintiff was, at the time he was restrained, of unsound mind and by reason thereof incapable of caring for himself and incapable of exercising rational self-control, and this condition of mind imperiled his own safety and rendered reasonable restraint necessary to protect him from injury, or if by reason of his mental condition he was incapable of exercising rational self-control and the lack of such power imperiled the safety of others, then one sustaining the relationship to him which this defendant sustained would be justified, under the law, in placing him under such restraint as was reasonably necessary to protect him against himself and the public from the dangers incident to his condition. Or, in other words, if the mental condition of the plaintiff was such that there was danger to himself or to others in permitting him to be at large, subject to the whims and caprices of an insane mind, then reasonable restraint would be justified and would afford him no basis for complaint. We think the general rule is, that where it is made to appear that one is not capable of rational self-control, and by reason thereof his own safety or the public safety is imperiled, one who, by relationship or otherwise, is the natural or proper custodian of an insane person may lawfully

restrain him in some proper place for treatment, for the good of the patient or for the protection of the public, and this without warrant and without judicial proceedings. The right to restrain an insane person is not governed by the general law, which provides that no one shall be deprived of life, liberty or property without due process of law. Restraint under such conditions does not offend against the constitutional inhibition. * * * The authorities limit the right to restrain an insane person of his liberty to proof of actual insanity and immediate danger to himself or to the public, and they unite in holding that the right to restrain for his own benefit and for the protection of others is not questioned, but is discussed as analogous to cases where one is in delirium of fever and would break away from his attendants, or one who is afflicted with a contagious disease. * * * The right of one to arrest and restrain another of his liberty on the ground of insanity is dependent upon the existence of the fact upon which the right is predicated. A citizen has not the right to arrest any member of society who may be deranged in his mind, and therefore, in order to justify his act when charged with wrongful arrest, he must show not only that the defendant was insane at the time, but also that to permit him to go at large imperiled his own safety or the safety of the public. It is not sufficient to show that he was lacking in mental capacity or had hallucinations, but it must go further and show that to permit him to go unrestrained imperiled his own safety or the safety of the public. It is not sufficient to show in cases of this kind that he had probable grounds for suspecting he was insane or probable reason for believing that his being at large would imperil the safety of the public. He must justify it by proving the fact upon which his right to restrain rested. * * * One who arrests another and restrains him of his liberty on the theory that he is incapable of rational self-control assumes the burden of showing that fact and the imminent

necessity for the restraint. This, we think, is the true rule and the sane and safe rule in matters of this kind." An extensive note to the case is appended, referring to many decisions.

The weight of authority appears to be that an insane person may, without any adjudication, be lawfully restrained of his liberty when to not do so would endanger his own life or the life of others, but such right to restrain is limited to cases of actual insanity and immediate danger. Insanity which does not render the insane person dangerous to himself or others is not a lawful excuse for restraint without a judicial proceeding. A private person who applies such restraint must act upon facts,—not suspicion or belief,—and takes the responsibility of an error of judgment. Some cases hold that relatives of one who is insane may commit him without judicial proceedings if they act in good faith for the insane person's benefit, but it seems evident in such cases the statute was different from ours, under which only a court can adjudge one insane. Under our statute no insane person shall be restrained of his liberty unless he has been legally adjudged insane, except that temporary detention of an alleged lunatic may be permitted for a reasonable time, not exceeding ten days, pending a judicial investigation of his mental condition. By practically all the authorities it is held that such imprisonment or detention without an adjudication is only authorized where the condition of the person is such that restraint is necessary for the protection of the insane person or others from his violence. At most, the evidence in this case fails to show plaintiff herself, or anyone else, was in immediate danger from her. Before she was placed in the sanitarium she exhibited no symptoms of a disposition to injure herself or anyone else. The nurse and doctor say they thought her presence in the house was detrimental to the recovery of her husband because she would go to his room to see him. The proof shows the husband's condition was not

so serious that he could not be removed to a hospital. It is apparent the consent of the son and daughter to have their mother taken to the sanitarium was due to the advice and influence of the nurse and doctor. The contract prepared by Dr. Brown and signed by the son and daughter recited they understood plaintiff was of unsound mind, but the daughter wrote Dr. Brown that she hoped he would not show the contract to plaintiff; that she did not regard her mother of unsound mind but that her condition was the result of bad health and worry. The daughter wrote letters to her mother at the sanitarium, and told her, among other things, that Dr. Hoag had assured her the proper thing to do was to send plaintiff to the sanitarium for care and rest. The son in a letter to Dr. Brown said that he did not regard the sanitarium as a "madhouse;" that his mother's trouble was purely nervous, and he wished her to have only such treatment as was best for her. The son and daughter did not initiate the plan to place plaintiff in the sanitarium but acquiesced in doing so upon the advice of others. Dr. Brown testified he considered plaintiff of unsound mind, but to make sure that there should be no misunderstanding he sent the son and daughter the contract to sign. If the family had not agreed to it he would not have detained plaintiff.

The fact that a person may be temporarily detained and placed under temporary restraint where conditions require it should not be expanded to authorize forcible detention and restraint of persons not actually insane or whose symptoms do not threaten with immediate danger themselves or others. Our constitution and laws protect citizens against deprivation of liberty except for good and reasonable cause shown. The evidence in this case fails to show any justification for committing plaintiff to the sanitarium, where the patients "are mainly people of unsound mind," and forcibly keeping her there two weeks. The enjoyment of

liberty is too precious to be denied one by individuals on their own responsibility, except in aggravated cases.

The verdict was contrary to the law and the evidence; the jury were erroneously instructed; it was error to allow the jury to take with them to the jury room the letters of plaintiff's son and daughter to Dr. Brown; and the court erred in not granting plaintiff's motion for a new trial.

The judgment will therefore be reversed and the cause remanded for a new trial.    *Reversed and remanded.*