436 P.2d 613

Arnold J. PATTERSON and Billie Marie
Patterson et al., Appellants,

v.

CITY OF PHOENIX, Appellee.

No. 8491.

Supreme Court of Arizona,
In Division.

Jan. 18, 1968.

Alan Philip Bayham, Phoenix, for appellants.

Robert J. Backstein, City Atty., Edward P. Reeder, Asst. City Atty., Melvin J. Mirkin, Phoenix, for appellee.

BERNSTEIN, Justice.

This is an appeal by Arnold J. Patterson, Billie Marie Patterson, Linda Patterson and Bobette Patterson, plaintiffs below, from an order of the Superior Court of Maricopa County granting summary judgment in favor of the City of Phoenix, defendant below.

The defendant in its motion for summary judgment relied on the depositions, affidavits, and pleadings which reveal the following undisputed facts. On July 9, 1963, at approximately 11:30 A.M., policewoman Lola Jean Harder, pursuant to the instructions of her sergeant, went to the home of Arnold J. Patterson to investigate a report that Linda Patterson, age eleven, and Bobette Patterson, age nine, were in such surroundings as to endanger their health, morals or welfare. When the officer arrived at the home she asked the children, who were alone at the time, if she might enter, and the children let her in.

Shortly after Officer Harder began questioning the children, Linda Patterson asked that any further discussion take place with Mrs. Sampson, their next door neighbor, present. Officer Harder complied by taking the two children to Mrs. Sampson's home where, with Mrs. Sampson present; Linda told the officer of the various immoral acts of her mother and stepfather.

The events described were the following. Mr. Patterson had made sexual advances toward Linda when on one occasion he attempted to force his tongue into her mouth, and on another occasion fondled the girl's private parts. In addition, Linda stated that her stepfather had made her swim in the nude with him in the family pool. She also stated that her parents slept without clothing, and induced her to view them in acts of sexual intercourse by refusing to permit her to close the door be-

tween their respective bedrooms. Furthermore, Linda told of being whipped with a strap by her stepfather, and his use of abusive language.

From this interview with the children coupled with the fact that Mrs. Sampson had been told of these incidents by Linda on a prior occasion, Officer Harder decided to take the children into custody. See A.R.S. § 8–221, subsec. B. After the children were taken into custody they were brought to the Maricopa County juvenile authorities for care.

Following some additional investigation by Officer Harder criminal charges were filed against Mr. and Mrs. Patterson under A.R.S. § 13–842, as then written, which provided:

"A person having custody of a child who wilfully causes or permits the life of such child to be endangered, its health to be injured or its moral welfare to be imperiled, by neglect, abuse or immoral associations, is guilty of a misdemeanor."

Subsequently, however, these charges were dismissed on motion by the county attorney. Immediately thereafter, the children, who had been kept from their parents for some eleven days, were returned to their home.

The cause presently before this court arises out of a suit filed by the Pattersons against the City of Phoenix for numerous alleged tortious acts committed by its police officers. In the Pattersons' suit the following claims were alleged: false imprisonment for the taking into custody of the two minor children; trespass by the City for the entry of Officer Harder into their home without a warrant; malicious prosecution for the criminal charges filed against them but later dismissed; and, defamation of character.

As to the defamation of character of the Pattersons they contend the claim arose

out of the following incident. Officer Harder, in an attempt to reach Mrs. Patterson at her place of employment, spoke to her employer on the phone. The employer, who knew generally that Mrs. Patterson was having difficulty with the police, asked Officer Harder why they were badgering the Pattersons. After some initial hesitancy the officer made a statement concerning the incidents which the children had discussed with her.

On appeal the Pattersons contend that the trial court erroneously granted summary judgment for the City of Phoenix based on an incorrect reading of our decision in Stone v. Arizona Highway Commission, 93 Ariz. 384, 381 P.2d 107 (1963). However, we must note that this contention is merely an assumption on the part of the Pattersons, and although both the City of Phoenix and the Pattersons proceed on the basis of the Stone decision that, nevertheless, the trial court may have reached its judgment on other grounds.

In any event, as we see it, an analysis of the present case before us requires an understanding of our decision in Stone. In that case we held that the doctrine of governmental immunity from tort liability was abolished, not only for that case, but for all other pending cases, those not yet filed which were not barred by the statute of limitations and all other future causes of action. Stone v. Arizona Highway Commission, supra.

■ Of course, one of the most important caveats to be noted is that a particular governmental unit is only liable on the theory of respondeat superior if the agent or employee acted within the scope of his employment. Stone v. Arizona Highway Commission, supra.

A critical part of Stone was the destruction of any distinction between proprietary acts [1] and governmental acts, which would

1. See Hernandez v. County of Yuma, 91 Ariz. 35, 369 P.2d 271 (1962); McQueary v. County of Yuma, 91 Ariz. 37, 369 P.2d 273 (1962) where we held that the county hospital would be liable for an employee's negligence which resulted in injury to a "paying patient," recognizing, in effect, governmental liability for the proprietary acts of the county.

recognize liability in the former and immunity in the latter. In the Stone decision we equated the two areas of governmental action for purposes of tort liability.

The injustice in the area of governmental immunity led many courts to delineate further distinctions in an attempt to limit that immunity. For example, a difference is recognized in the area of governmental action between those acts that are purely ministerial and those acts requiring the exercise of discretion. Indeed, before the Stone decision this court had carved out certain areas of liability for distinctly ministerial acts. See Harlan v. City of Tucson, 82 Ariz. 111, 309 P.2d 244 (1957); City of Phoenix v. Mayfield, 41 Ariz. 537, 20 P.2d 296 (1933) (dealing with the city's liability for injury caused by its failure to maintain streets and sidewalks in proper condition.)

The question raised on this appeal is whether under the Stone decision the City of Phoenix is liable for the acts of its police officers acting within the scope of their authority, if those acts are discretionary.

In order that there be no confusion in the future we deem it necessary to examine the City's argument that police officers must exercise discretion in their duties, and that consequently the City should not be held liable for an officer's discretionary acts.

Admittedly, police officers do exercise discretion in the execution of their duties. Yet, every human act requires the use of some discretion. Indeed, as one respected commentator has concluded:

"The dichotomy between 'ministerial' and 'discretionary' is at the least unclear, and one may suspect that it is a way of stating rather than arriving at the result." Jaffe,

Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209, 218 (1963).

Perhaps the highwater mark was reached when the United States Supreme Court decided Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Dalehite was a case arising from the 1947 Texas City disaster in which almost 600 people were killed, 3,000 injured, and damages totalled more than 200,000,000 dollars. Apparently the explosion resulted from either the negligent loading of a vessel or a negligent choice of procedures for loading. In interpreting the discretionary function exception under the Federal Tort Claims Act the Supreme Court held in Dalehite that the disaster was caused by the exercise of a discretionary function in the planning as opposed to operational stage, and therefore no liability could be imposed on the government.[2]

The only logical justification advanced by some commentators for relieving police officers from tort liability based on a wrongful exercise of their discretion is that "the broad threat of personal financial liability hanging over police officers in the performance of official duty must serve—at least to men normally concerned with home and family—as a continual and substantial deterrent to vigorous law enforcement." Mathes and Jones, Toward a "Scope of Official Duty" Immunity For Police Officers in Damage Actions, 53 Geo.L.J. 889, 907 (1965).

Nevertheless, in this state we take judicial notice of the statutes which permit insuring governmental agents and agencies. See A.R.S. § 38–641 (State); A.R.S. § 11–261 (Counties); A.R.S. § 9–497 (Cities and Towns). We conclude, therefore, that whatever fear a police officer might suffer

2. In a vigorous dissent Justice Jackson made it quite clear that he believed the court was influenced by the magnitude of the injuries sought to be recompensed rather than on any legal theory. He stated: "[T]he ancient and discredited doctrine that 'The King can do no wrong' has not been uprooted; it has merely been amended to read, 'The King can do only little wrongs.'" 346 U.S. at 60, 73 S.Ct. at 980.

Congress soon corrected this injustice by passing a law granting relief to the litigants limited to 25,000 dollars. See Act of Aug. 12, 1955, Ch. 864, § 5, 69 Stat. 707.

with regard to personal financial loss is certainly diminished where liability insurance exists. In any event, in the case at bar such an argument is specious where the city and not the police officer is sued.

Moreover, the general rule across the nation is that although the municipality is immune from liability a police officer is personally liable for torts committed within the scope of his employment except where his acts are specifically authorized by statute, regulation or court process, or permitted by the thin shade of privilege which his office provides. See, Cal.Law Revision Comm'n Study Relating To Sovereign Immunity 404–55 (1963); Smith, The Use of Deadly Force by a Peace Officer in the Apprehension of a Person in Flight, 21 U.Pitt.L.Rev. 132 (1959); Note, The Civil Liability of Police Officers for Wounding or Killing, 28 U.Cinc.L.Rev. 488 (1959); Annot., 60 A.L.R.2d 873 (1958).

Indeed, our court in Ruth v. Rhodes, 66 Ariz. 129, 185 P.2d 304 (1947), held that a state highway patrolman could be held liable for injuries resulting from his negligent operation of a police vehicle while driving in response to a radio order to proceed to the scene of an automobile accident.

In those states that have abrogated the doctrine of governmental immunity the municipality is liable for the tortious acts of its police officers committed within the scope of their employment. See, e. g. City of Phoenix v. Camfield, 97 Ariz. 316, 400 P.2d 115 (1965) (negligence); Hargrove v. Town of Cocoa Beach, 96 So.2d 130, 60 A.L.R.2d 1193 (Fla.1957) (negligence); City of Miami v. Simpson, 172 So.2d 435 (Fla.1965) (intentional torts); City of Miami Beach v. Nye, 156 So.2d 205 (Fla. App.1963);[3] Peters v. Bellinger, 22 Ill.App. 2d 105, 159 N.E.2d 528 (1959) (reversed on other grounds); McAndrew v. Mularchuk, 33 N.J. 172, 162 A.2d 820, 88 A.L.R. 2d 1313 (1960).

It should also be noted that in the cases cited above the "discretionary—ministerial" dichotomy was not recognized by the courts as being applicable in the cases before them. Indeed, one might argue that police have a duty to enforce the laws, and as such their duty is purely ministerial.

As we see it, no rational excuse exists for refusing to hold a municipality liable for the torts of its police officers committed within the scope of their employment where the police officers themselves are liable.

■ Consequently, we conclude that although police officers exercise some discretion in the execution of their duties that, nevertheless, under the doctrine of respondeat superior a municipality is liable for those acts of its police officers within the scope of their employment.

In applying our holding to the instant case certain statutory provisions are pertinent.

At the threshold we must consider the effect of A.R.S. § 8–221, subsec. B which permits a peace officer to take a child into custody where the child's surroundings are such as to endanger his health, morals or welfare *unless immediate action is taken*. The statutory provision reads as follows:

"This article shall not be construed to prohibit a peace officer from taking into custody a child who is found violating a law or ordinance, *who is reasonably believed* to be a fugitive from his parents or from justice, *or whose surroundings are such as to endanger his health, morals or welfare unless immediate action is taken*." (Emphasis added.)

Obviously, the legislature, in its wisdom, foresaw instances where children would be in such surroundings that they would suffer serious harm without immediate aid in the form of police custody. To that end § 8–221, subsec. B was promulgated.

3. The only restriction in Florida law regarding municipal liability for police torts is found in Fisher v. City of Miami, 172 So.2d 455 (Fla.1965), which held a tort victim could only sue the municipality for compensatory not punitive damages.

The problem arises in determining when "immediate action" must be taken. Because of the existence of A.R.S. § 14–843 it appears that the legislature also considered that there could be cases where time would not be available to get a juvenile warrant. A.R.S. § 14–843 provides in part:

＊　＊　＊　＊　＊　＊

"C. When it appears to the court, either from a verified petition, or affidavits, that the welfare of the minor will be imperiled if he is permitted to remain in custody of the person then having care of him, the court may make an order providing for temporary custody of the minor until hearing on the petition.

"D. When there is *reason to believe the minor* will be taken from the jurisdiction of the court before which application is made, *or will suffer irreparable injury before compliance with the order for temporary custody can be enforced, the court may at the time of making the order for temporary custody cause a warrant to be issued, reciting the facts, and directed to the sheriff or any constable of the county, commanding the officer to take the minor from the custody of the person in whose care he then is and place him in such custody as the court orders."* (Emphasis added.)

■ Reading § 8–221, subsec. B in this light we believe a peace officer is authorized to take a child into custody where the officer reasonably believes the child's health, morals or welfare will be endangered unless immediate action is taken. Moreover, in the clause preceding the one under discussion the legislature used the words "reasonably believed", so that the pertinent part of the statute reads, "＊　＊　＊ [a child] *who is reasonably believed* to be a fugitive from his parents or from justice,

*or whose surroundings are such as to endanger his health, morals or welfare unless immediate action is taken"* can be taken into custody by a peace officer. (Emphasis added.)

The authorization to take a child into custody under special circumstances without a warrant is analogous to a police officer's power in a limited area to arrest without a warrant. See A.R.S. § 13–1403 (which sets forth the five instances in which a peace officer may arrest without a warrant).

In Christiansen v. Weston, 36 Ariz. 200, 284 P. 149 (1930), we were confronted with the necessity to fashion a rule to guide police officers in the arrest of insane persons. In that case we said:

"We hold, therefore, that where an officer arrests a person on suspicion of insanity, without first filing a complaint and obtaining an order of court for the arrest, in an action of false imprisonment, he can justify only by showing by a preponderance of the evidence that he had *reasonable ground to believe, and did believe at the time, not only that defendant was insane, but that he was in such a condition it would not be safe to delay his arrest until proper process could be obtained."* 36 Ariz. at 210, 284 P. at 153. (Emphasis added.)

■■ Examining the record with these factors in mind we are convinced that Officer Harder reasonably believed the children were in such surroundings sufficient to constitute an immediate danger under the statute. The officer's deposition reveals what the child told her in the presence of Mrs. Sampson, and since we must, in the arena of summary judgment, take Officer Harder's statements in her deposition as true when they are uncontroverted,[4]

---

4. At this juncture we should note that in her disposition Mrs. Patterson stated that Linda denied making the accusations when she was returned to her home. The testimony was as follows:

"Q. When you got the children back, did you ask them about the alleged accusations they had made?

"A. Yes.
"Q. What did they say?
＊　＊　＊　＊　＊
"A. ＊　＊　＊ Well, I told her—I confronted her with these things and for instance, I told her about the incident in swimming. Well, she said 'Mama, that's not true.' Well, I knew it wasn't

we conclude that the child's statements concerning her parents' sexual behavior, together with Mrs. Sampson's corroboration that Linda had told her of these incidents before, were sufficient to justify "immediate action" without first obtaining a juvenile warrant. Since in this respect Officer Harder's deposition is uncontroverted no issue of fact exists with regard to the claim of false imprisonment, and summary judgment was proper. Rule 56(c), Sup.Ct. Rules of Civ.Proc., 16 A.R.S.

We turn now to the question whether Officer Harder lawfully entered the Patterson premises so as to free both her and the City from liability for trespass. In this regard we believe it is necessary to note that the officer's deposition shows that the children permitted her to enter, and there is nothing to show that they resisted. Yet, in any event, the officer had gone to the Patterson home pursuant to a report that the children were in danger.

Consequently, no issue of fact is present with respect to the trespass claim, and therefore, as a matter of law summary judgment was proper as to this claim.

The next claim alleged by the Pattersons was for malicious prosecution. The officer who brought the charges against them was Officer Ed Jolly. The record clearly reveals that Officer Jolly had sufficient probable cause to file charges. Clearly there is no need to discuss the other elements of malicious prosecution when the record indicates a lack of the crucial element of "no probable cause." When an officer has probable cause to instigate proceedings that is a complete defense to the action. Overson v. Lynch, 83 Ariz. 158, 317 P.2d 948 (1957); McClinton v. Rice, 76 Ariz. 358, 265 P.2d 425 (1953). Moreover, the depositions indicate that Officer Harder did some additional investigation by contacting certain neighbors, who verified in part some of the incidents.

Subsequently, she gave her complete report to Officer Jolly. On the basis of the child's statements and the statements of the neighbors we think there was a sufficient showing for the trial court to determine that Officer Jolly had probable cause to institute charges. Of course, a subsequent dismissal of the charges does not affect the existence of probable cause at the time the charges were filed. There could be any number of reasons for dismissal having no bearing whatscever on the existence of probable cause at the time the proceedings were initiated. Consequently the trial court was correct in granting a summary judgment for the City on this claim.

The last cause of action against the City is for defamation of character arising out of a communication made by Officer Harder to Mrs. Patterson's employer regarding the Pattersons' conduct with their children. Officer Harder admits she made such a communication. Since the Pattersons sued only the City of Phoenix the critical question for our determination is whether, assuming the statement to be defamatory, it was within the scope of the officer's employment to make such a communication, and whether the statement was made in furtherance of the master's business. There is perhaps, as some commentators have suggested, some " * * * logical support for according an officer a qualified or conditional privilege which would protect him from liability for statements made that bear on the prosecution or detection of a crime and that are directed at an individual who is, in some concrete manner, connected in some capacity to that crime." Maxey, Police Tort Liability for Defamation, 16 Clev.-Mar.L.Rev. 435 (1967).

The Texas court delineated the following five prerequisites that must be met before a conditional privilege will be recognized: (1) the communication must be made in aid of law enforcement, and the officer must

---

true, but yet I had to hear my child say it."
This statement, however, is certainly irrelevant to the court's determination of

probable cause, not only because it is hearsay but also because it is self-serving. Mrs. Patterson was not present when the accusations were made by Linda.

be in the discharge of his duty, (2) the communication must be made in good faith, (3) the officer cannot repeat a rumor which could easily be found to be untrue, (4) the officer must have jurisdiction, and (5) the officer must be actively preventing a wrong to another or to the public. Missouri Pac. Railway Co. v. Richmond, 73 Tex. 568, 11 S.W. 555, 557, 4 L.R.A. 280 (1889).

In the instant case the record reveals that Officer Harder made the communication in question in the discharge of her duty while conducting a police investigation. She wished to speak to Mrs. Patterson over the phone but the employer prevented her from doing so. Officer Harder, in her deposition, testified that she made the communication, claimed to be defamatory, only after it became clear to her that it was a necessary means to obtain the employer's permission to talk to Mrs. Patterson. On these facts the conditional privilege attaches, and since there is no indication in the record of any bad faith on the part of Officer Harder the trial court properly granted summary judgment for the City in this regard.

One additional contention is raised by the Pattersons. They argue that the trial court erred when it ordered that they set forth their claims in separate counts. This is a matter within the sound discretion of the trial court. Bicknell v. Lloyd-Smith, 25 F.Supp. 657 (E.D.N.Y.1938); Rule 10 (b), Sup.Ct. Rules of Civ.Proc., 16 A.R.S. The trial court did not abuse its discretion.

Judgment affirmed.

McFARLAND, C. J., and LOCKWOOD, J., concur.