OPINION
BIRDSALL, Judge.
This appeal is from a judgment in favor of the defendants following a trial to the court sitting without a jury. The trial court made findings of fact and conclusions of law pursuant to request under Rule 52(a), Rules of Civil Procedure, 16 A.R.S. The complaint was for damages resulting from both physical and mental injuries. The appellant claimed the defendants assaulted him, unlawfully restrained him and caused him to become lost and exposed to the elements in the Baja peninsula in Mexico.
On appeal it is claimed that the judgment was contrary to the weight of the evidence and contrary to the law. We affirm.
The appellant, a student at the University of Arizona enrolled to go on an ecology field trip to the Baja peninsula conducted by the university. Appellee Robert R. Humphrey was employed by the university to conduct the educational aspects of the trip. Appellee Michael Symons was engaged to furnish the necessary transportation, food and shelter. Unknown to anyone involved, the appellant suffered from a chronic mental and emotional disorder. He had been under the care of a psychiatrist for several years. This mental illness was exacerbated by the experience of the trip to the point where the appellant was a threat to the safety of himself and other members of the group. He had delusions that the other persons were “mafioso” who were going to kill him; on a boat trip to Ventana Island, he believed he was going to be thrown to the sharks; on two occasions he had a knife. The trial court found that this created potentially serious harm. On several occasions, including after dark, the appellant ran away from the group, once to the village of Bahia de los Angeles, 15 miles away. The site where the study group had its permanent camp was in a remote area and the surrounding desert and mountains were dangerous. There was testimony that both rattlesnakes and cholla cactus presented serious problems.
The trial court made 34 separate findings of fact. Since these findings explain the bizarre emergency created by the appellant’s conduct we quote from them.
“7. During the Baja California trip, Jonathan exhibited signs of eccentricity, including a tendency to remain to himself or to be distrustful of other members of the group, but he did not exhibit recognizable signs of serious mental problems *85 until after the boat trip to La Ventana Island.
11. Jonathan obtained possession of a knife on at least two occasions on the trip — one prior to going to La Ventana Island with the study group, and the other while he was being returned to camp from the village of Bahia do [sic] los Angeles. These occasions created a potential of serious harm.
14. Upon return from La Ventana Island, Jonathan left the group and went to the village of Bahia de los Angeles under the unfounded delusion that the members of the group were members of the Mafia and were going to harm or kill him.
16. Members of the study group including Dr. Humphrey and Mike Symons went to Bahia de los Angeles and persuaded Jonathan to return to the camp with them____
17. On the way from the village to the camp, Jonathan was again taken by a delusion that he was in the custody of the Mafia and that they were going to kill him. He thereupon attempted to jump from the moving vehicle and had to be physically restrained. In the ensuing struggle, he obtained a knife, which the other members of the party present at the time reasonably believed he intended, or might have used on them. The members of the party acted reasonably and properly in attempting to restrain him.
18. Following the struggle, Jonathan was subdued, and he asked the members of the group to permit him to walk a short distance from the vehicle to urinate. He was permitted to do this, and thereupon again ran off into the desert. This occurred at approximately midnight, and Jonathan was totally unfamiliar with the area.
19. The members of the group, and particularly Oscar Paulin and Jose Carlos, were able to catch Jonathan, and they returned him to the vehicle, and subsequently to the camp. No excessive force was used to do this.
20. That night Jonathan was placed in the tent in the company of Oscar Paulin and Jose Carlos, while Mike Symons slept immediately outside the tent. He was not otherwise physically restrained. This was done upon the reasonable belief that otherwise he would run off into the desert or the mountains, where there was a reasonable possibility of serious injury or death.
21. The following morning Dr. Humphrey and Mike Symons took the Zodiac inflatable boat across Bahia de los Angeles to the village, contacted an American pilot who was flying back to the United States, and requested that the pilot get word to Jonathan’s parents and to the University of Arizona that Jonathan was having mental and emotional problems and should be returned to the United States. This was a reasonable manner of communicating with responsible persons in the United States given the remoteness of the area and the nature of communications from the village.
23. Prior to taking the Zodiac across the bay, Mike Symons restrained Jonathan by placing him in a pickup truck and tying his hands and feet. This was done with the reasonable belief that Jonathan would otherwise run off into the desert or the mountains and run a significant risk of serious injury or death. The restraint that was used was reasonable under the circumstances, and no undue force or restraint was used. While he was so restrained he was in the company of Dr. Keith Pierce who attempted to make sure that Jonathan was not unduly uncomfortable, that he was fed, and that his needs were attended to. During this period Jonathan showed no fear or irrational belief that he was in the custody of anyone wishing him harm.
26. Upon the return of Dr. Humphrey and Mike Symons from the village, the *86 group broke camp. Symons, Pierce and Jonathan drove to the village to await the arrival of Jonathan’s father. The other members of the study group, including Dr. Humphrey, went to a different location to continue the study of the ecology of the area.
27. Upon arriving at the village, Jonathan, without notice and without reason, again attempted to flee. He was chased by Mike Symons who was reasonably attempting to retain him in custody until the arrival of Jonathan’s father. Mike Symons used a stick to strike Jonathan as he was chasing Jonathan. Symons and Keith Pierce were arrested by Mexican authorities under the mistaken belief that they were attempting to harm Jonathan.
28. Upon the return of the remainder of the study group to the village, Dr. Humphrey again attempted to assure Jonathan that his father was on his way to the village in an airplane and that Dr. Humphrey had talked with his mother who gave her love and assurances. Dr. Humphrey gave his own assurances that there was no cause for fear or alarm. Nevertheless, Jonathan again fled from the area and ran into the mountains where he became lost. He was only found after a substantial search involving both members of the study group, including Dr. Humphrey, and residents of the village. Jonathan sustained physical injuries during the period of time he was lost.”
All of these findings are supported by the evidence. In the other findings which we have not set forth at length, the trial court found that all of the protective measures taken by the appellees were without animosity to Jonathan; no harm was intended; the appellees reasonably believed the appellant was mentally incompetent and a threat to himself and other members of the group; no one was responsible for creating Jonathan’s delusions; the appellees acted promptly and reasonably after having reason to know of the appellant’s serious mental disorders; his temporary detainment (and the means taken to effect it) was reasonably necessary and justified and in the best interests of Jonathan and other members of the group; the striking with the stick did not injure him. Finally the court made finding No. 32:
“All restraint of Jonathan was done when Jonathan was mentally incompetent and at a time when Michael Symons, Dr. Humphrey and all other members of the party reasonably believed that Jonathan was about to commit an act or acts likely to cause serious bodily harm to himself or to others, and the restraint was done for the purposes of protecting Jonathan from injuring himself or others and in order to give custody of Jonathan to his father so that proper care could be taken of Jonathan. No reasonable alternative, such as the ability to initiate a timely and reasonably prompt commitment procedure in Mexico was reasonably available.”
All of these conclusory findings were also supported by ample evidence.
In his argument that the judgment was contrary to the weight of the evidence, the appellant makes two contentions:
1. That he was never a danger to himself or others, and
2. That he was always safe and his detainment and restraint was negligent.
No evidence supports these arguments. The court’s findings refute these arguments and are supported by overwhelming evidence. As the appellees argue, if they had done nothing, that would have been negligence.
Turning to the contention that the judgment is contrary to law, the appellant argues that somehow the statutes pertaining to civil commitment of an insane person should have been followed. See A.R.S. § 36-533. As a practical matter, this procedure was impossible in Baja. It seems clear to us again that the appellant and others in the group were seriously endangered and that emergency measures were necessary.
*87 The controlling law is set forth in Christiansen v. Weston, 36 Ariz. 200, 284 P. 149 (1930):
“If, however, it appears that a person is dangerously insane, so that he is an immediate menace to himself or others, if allowed to be at large, it is then permissible for any person — whether an officer or not — to arrest the insane person without process, and detain him until proper process can issue. Colby v. Jackson, 12 N.H. 526; Bisgaard v. Duvall, 169 Iowa 711, 151 N.W. 1051.” 36 Ariz. at 210, 284 P. 149.
The trial court relied upon Christiansen and so do we. We reject the appellant’s argument that the case is too old to be reliable. We find it cited with approval in Patterson v. City of Phoenix, 103 Ariz. 64, 436 P.2d 613 (1968), and discussed in two annotations, 30 A.L.R.3d 523 at 553 and 92 A.L.R.2d 570 at 573 and 579.
In the latter annotation the law is summarized:
“The basic common-law rule is that a person who is so insane as to be dangerous to himself or others may be arrested and detained without judicial or quasi-judicial proceedings, when there is an urgent necessity to prevent immediate injury to such person or to others.” 92 A.L.R.2d at 571.
And again, the fundamental rule is said to be that anyone can arrest a person actually insane and dangerous:
“The long-established common-law rule is that a person actually insane may be arrested and detained by any interested party, without a warrant or legal process first issuing in a judicial or quasi-judicial proceeding to have the person declared a lunatic or confined as an insane person, when an arrest is necessary to prevent immediate bodily injury to the arrestee or another. As usually expressed, the common-law rule emphasizes the elements of (1) actual insanity, (2) urgency, and (3) necessity.” 92 A.L.R.2d at 572-3.
Christiansen, however, involves the actions of a police officer. Thus the foregoing quotation is obiter dictum insofar as it refers to “... any person — whether an officer or not ... ”. Since no Arizona decision directly considers the liability of a person other than an officer, we turn to the reported decisions of other jurisdictions and the Restatement.
Thus in Emmerich v. Thorley, 35 App. Div. 452, 54 N.Y.S. 791 (1898), the court was required to consider the legal responsibility of a private person acting “of his own motion”, and without judicial warrant or process, for interfering with the liberty of another on an allegation of insanity. The court said:
“... In such cases there is no justification for interference or restraint unless it is demanded by a real necessity for the care and safety of an individual, dangerous to himself, or for the protection of others, to whom he is or may be dangerous. Whoever, merely as a private person, applies such restraint, must act upon facts, and not upon suspicion or belief. He may have to take the responsibility of his errors of judgment. But, where the facts show the danger and the necessity, no actionable trespass is committed, and such has always been the law in England and in this country.” 54 N.Y.S. at 793.
Maxwell v. Maxwell, 189 Iowa 7, 177 N.W. 541, 10 A.L.R. 482 (1920) involved an alleged false arrest and imprisonment of a person of unsound mind. The court held:
“If the plaintiff was, at the time he was restrained, of unsound mind, and by reason thereof incapable of caring for himself and incapable of exercising rational self-control, and this condition of mind imperiled his own safety and rendered reasonable restraint necessary to protect him from injury, or if by reason of his mental condition he was incapable of exercising rational self-control, and the lack of such power imperiled the safety of others, then one sustaining the relationship to him which this defendant sustained would be justified, under the law, in placing him under such restraint as was reasonably necessary to protect himself against himself and the public from *88 the dangers incident to his condition.” 177 N.W. at 542.
And see Crawford v. Brown, 321 Ill. 305, 151 N.E. 911, 45 A.L.R. 1457 (1926). And Appeal of Sleeper, 147 Me. 302, 87 A.2d 115 (1952); Stizza v. Essex County Juvenile and Domestic Relations Court, 132 N.J.L. 406, 40 A.2d 567 (1945); Re Allen, 82 Vt. 365, 73 A. 1078, 26 L.R.A., N.S., 232 (1909). All of these opinions recognize that at common law a person dangerous to himself or others may be temporarily restrained without legal process.
Two sections of the Restatement Second of Torts (1965) address the legal question presented here.
Section 120 provides in part:
“... a private person is privileged to arrest another without a warrant
(c) if the other is mentally incompetent' and the actor reasonably suspects that the other is about to commit an act likely to cause death or serious bodily harm to himself, to the actor, or to some other person, or serious harm to land or chattels, and the arrest is made for the purpose of securing the commitment of the other.”
Section 156 provides:
“One who is under a duty to protect a third person or his land or chattels against harm from the misconduct of another is privileged to use such force against or to impose such restraint upon the other as is
(a) reasonable in view of the threatened harm, and
(b) reasonably necessary for the performance of his duty.”
We hold, as stated in Christiansen, supra, that where a person is a danger to himself or others because of his mental condition, that it is lawful to restrain him so long as necessary until other lawful measures can be followed.
The appellant even argues that the appellees should have been found liable as a matter of law since their conduct was intentional. We reject this contention. We have already recognized the conduct was intentional. Intentional acts done out of necessity to prevent harm to one or more persons are not actionable so long as they are reasonable. Christiansen, supra.
Affirmed.
HOWARD, C.J., and HATHAWAY, J„ concur.