**William Allen SPENCER, Plaintiff–Appellant,**

v.

**Bumyong LEE, M.D., and St. Elizabeth Hospital, Defendants–Appellees.**

**No. 87–1203.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1988.

Reheard En Banc Sept. 27, 1988.

Decided Jan. 3, 1989.

Joel J. Africk, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Lynn D. Dowd, Thomas, Hinshaw & Culbertson, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

POSNER, Circuit Judge.

Do a private physician and a private hospital act under color of state law, and therefore lay themselves open to suit under 42 U.S.C. § 1983, when they commit a mentally disturbed person? Adhering to *Byrne v. Kysar*, 347 F.2d 734 (7th Cir. 1965), and *Duzynski v. Nosal*, 324 F.2d 924, 929–31 (7th Cir.1963), we hold they do not. The other courts that have addressed this issue agree with our position, see *Hall v. Quillen*, 631 F.2d 1154 (4th Cir.1980), and cases cited there, with the exception of the plurality opinion in *Burch v. Apalachee Community Mental Health Services, Inc.*, 840 F.2d 797, 803 (11th Cir.1988) (en banc), which however devoted only three sentences to the issue and cited no authority for its conclusion.

The plaintiff, William Spencer, appeals from the dismissal of his complaint for failure to state a claim, so we must proceed on the assumption that the facts alleged in the complaint are true. In 1982 and 1984, Spencer's physician, defendant Bumyong Lee, authorized Spencer to be involuntarily committed to St. Elizabeth Hospital. On the second of these occasions the police were called in to take Spencer to the hospital against his will, and on the fourth day of his five days of hospitalization Dr. Lee directed a nurse to inject Spencer with a drug. Spencer protested that he was allergic to the drug, but he was injected anyway and sustained bodily injury. Spencer seeks damages under 42 U.S.C. § 1983 for the deprivation of his liberty without due process of law and for the reckless infliction of injury during his second confinement. Pendent counts seek damages under the common law of Illinois for false imprisonment and malpractice. Spencer had no lawyer in the district court, and his complaint is barely coherent. The district court ordered him to furnish a more definite statement of his claim. In response, Spencer submitted medical records which indicate that Dr. Lee was his regular physician at the time of the commitments; that the first commitment was for attempted suicide and was voluntary; that his father signed the petition for the second commitment; and that another doctor—not Dr.

Lee—signed the medical certificate for that commitment. These documents depict Spencer as a schizophrenic with suicidal tendencies who has been in and out of mental institutions many times. Among his delusions are that "all winter he was sick until this time when the police starting a kind of prostitution operation also near motel where he is staying, they have been running a chain saw, the chain saw produced hormones in his testes and he couldn't sit still." This is from one of Dr. Lee's reports but is corroborated by Spencer's request in the district court for an injunction that would "bar St. Elizabeth hospital from damaging my hearing with circular saws." However, the district judge did not rely on any of the medical records—which Spencer did not vouch for (he just produced them in response to the judge's order) and has had no chance to explain (away)—and we won't rely on them either.

The casting of this lawsuit as one for the redress of a violation of the Fourteenth Amendment's due process clause, which forbids *states* to deprive persons of life, liberty, or property without due process of law, would certainly strike the innocent eye as puzzling. The due process clause is directed to action by state government; 42 U.S.C. § 1983 creates a remedy against persons acting under color of state law, such as police officers. The defendants in this case are not public employees. They provide no services under contract to the state government or any of its subdivisions. They do not participate (so far as is relevant to this case) in any state or other governmental programs. A purely private physician and a purely private hospital are alleged to have confined the plaintiff against his will and to have injured him by improper medical treatment. These are classic allegations of false imprisonment and malpractice—torts for which the common law of Illinois provides remedies that the plaintiff does not suggest are inadequate.

In arguing that the defendants are nonetheless state actors for purposes of the Fourteenth Amendment and section 1983, the plaintiff relies on the Illinois Mental Health and Developmental Disabilities

Code, which provides that "when a person is asserted to be subject to involuntary admission and in such a condition that immediate hospitalization is necessary for the protection of such person or others from physical harm, any person 18 years of age or older may present a [commitment] petition to the facility director of a mental health facility in the county where the respondent resides or is present." Ill.Rev. Stat. ch. 91½, § 3–601(a). The petition must include much factual detail and be accompanied by a certificate, signed by a physician or other qualified professional, stating that the respondent requires immediate hospitalization and that the physician has examined the respondent within the previous 72 hours, and setting forth the factual basis for the physician's opinion that immediate hospitalization is required. §§ 3–601(b), 3–602. Within 24 hours of the respondent's admission to the mental health facility, the facility must forward the relevant papers to the local state court, which must in turn hold a hearing within 5 days (exclusive of weekends and holidays— so the longest possible prehearing commitment is 8 days) on whether there are grounds for continuing to hold the respondent. § 3–611.

This complex of provisions, Spencer argues, operates to "deputize" private physicians such as Dr. Lee and private hospitals such as St. Elizabeth to carry out the exclusive state function of committing the mentally ill. Compare *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344, 1346 (7th Cir.1986). For a maximum of eight days these ostensibly private actors are empowered by the Mental Health Code to hold and treat people against their will. This power, Spencer concludes, is a state power that does not cease to be such merely because delegated to private persons.

If the State of Illinois ordered or encouraged private persons to commit the mentally ill, they would indeed be state actors, for they would be doing the state's business. See our recent discussion in *United States v. Koenig*, 856 F.2d 843, 847–51 (7th Cir. 1988). It would make no difference that

they were not technically employees of the state. Or if the state decided to contract out the provision of state highway police or the administration of state prisons to private entrepreneurs of security and correctional services, the entrepreneurs and their employees would (we may assume) be state actors. The details of the contractual relationship between state agencies and the persons who actually implement state policy—whether those persons are state employees or independent contractors or the employees of independent contractors—are of no moment. In accordance with *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), we may further assume that if the state allowed a residential subdivision or high-rise apartment building to form its own de facto municipal government, that government would be an arm of the state for purposes of the Fourteenth Amendment, just as de jure municipal governments are; again the technicality of governmental employment would not control the case. The Fourteenth Amendment does not prescribe the structure of state government. *United Beverage Co. v. Indiana Alcoholic Beverage Comm'n*, 760 F.2d 155 (7th Cir.1985). Who does the state's business is the state's actor.

At the opposite extreme is the situation where the state decides to reduce the scope of government. Suppose the state owned a railroad, and decided to sell it to a private person. Would the new owner be deemed a state actor under the Constitution, on the ground that the state had "deputized" him to operate "its" railroad? He would not. The scope of government is not fixed; deregulation does not create a host of state actors in the private sector, like the moraine that marks the farthest advance of a glacier. Certain powers, however, are "traditionally the exclusive prerogative of the State," and their exercise by private persons is state action. *Blum v. Yaretsky*, 457 U.S. 991, 1005, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982). *Marsh* can be understood in this light—as a case not of deregulation, but of the delegation of public powers to private actors.

■ We have to situate the present case in this grid. It is not a case of governmental encouragement or direction of private persons; and "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky, supra*, 457 U.S. at 1004, 102 S.Ct. at 2786. See also *Tunca v. Lutheran General Hospital*, 844 F.2d 411, 414 (7th Cir.1988); *Ezpeleta v. Sisters of Mercy Health Corp.*, 800 F.2d 119, 122 (7th Cir.1986). Spencer does not suggest that the relevant provisions of the Mental Health Code were enacted because the state wants to encourage commitments, any more than state repossession laws are passed because states want to encourage creditors to repossess their debtors' goods. See *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). His argument is that the commitment of the mentally ill, like the arrest of criminal suspects, is so central and traditional a function of government that the state cannot limit its responsibility for performing the function. Any private individual who is empowered to commit a person to an institution against the person's will *is* government, just as the "company town" in *Marsh* was a part of the government of Alabama, although a part that had been handed over to a private entity to administer.

■ Spencer is thus appealing—with support in the language of cases like *Blum* and in the outcome of *Marsh*—to the idea that governmental functions that have traditionally been the *exclusive* prerogative of government, usually because they involved a high degree of coercion, can be delegated but not abandoned. The treatment of the mentally disabled, however, as of the sick and infirm generally, is not such a function. See, e.g., *Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982); *Musso v. Suriano*, 586 F.2d 59, 63 (7th Cir.1978); *Hoyt v. St. Mary's Rehabilitation Center*, 711 F.2d 864, 866 (8th Cir.1983); *Taylor v. First Wyoming Bank*, 707 F.2d 388 (9th Cir.

1983), and cases cited there. The issue here, it is true, is involuntary commitment rather than treatment. But the analogy that Spencer seeks to draw to arrest is inapt, since a citizen's arrest is not subject to challenge under section 1983. *Lee v. Town of Estes Park*, 820 F.2d 1112 (10th Cir.1987); *Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir.1987); *Bryant v. Donnell*, 239 F.Supp. 681, 687 (W.D.Tenn.1965); cf. *Griffin v. Maryland*, 378 U.S. 130, 135, 84 S.Ct. 1770, 1772, 12 L.Ed.2d 754 (1964) (where this proposition seems to have been assumed). Nor is the exercise of self-defense, or the defense of property by evicting trespassers or repossessing chattels, state action, even though self-defense often and the defense of property sometimes involve a degree of force characteristic of police operations. There have been citizen arrests for as long as there have been public police—indeed much longer. In ancient Greece and Rome, and in England until the nineteenth century, most arrests and prosecutions were by private individuals. (Some crimes, e.g., shoplifting, are still privately prosecuted in England.) Arrest has never been an exclusively governmental function. Not all state-authorized coercion is government action.

This cannot be the end of the case. That Socrates was prosecuted by a private denouncer does not place the prosecution of crime in Illinois today outside the core of governmental functions. Every function performed by government has an analogue that was performed privately when government was rudimentary, or before there *was* government—for social order is older than government. The tradition that establishes a core of exclusive governmental functions does not reach back so far.

But history is relevant. The question we are trying to answer is whether a private person is doing the state's business and should be treated as an employee or other formal agent of the state. So we ask, is there a tradition of treating civil commitment of the mentally disturbed as a governmental function and, if so, how well established is it? The brief and argument of Mr. Spencer's distinguished counsel do not enlighten us on this question. At argument he said it would make no difference if Illinois had been following the procedure set forth in the current Mental Health Code for the last 200 years. But it would make *some* difference. It would tend to show, although it would not prove, that commitment had not been an exclusively public function, any more than transportation, or the removal of trespassers from one's property, or the repossession of goods from a defaulting debtor are exclusively public functions—that almost a century before the enactment of the Fourteenth Amendment, private persons were doing what Spencer contends is the work of the state today *even when done by private persons*, such as Dr. Lee and St. Elizabeth Hospital.

The specific provisions of the Mental Health Code dealing with emergency commitment by private physicians to private hospitals are not 200 years old; they are less than 50 years old. See Revised Mental Health Act, art. 5, 1945 Ill.Laws 1011. But commitment has long been a private remedy, albeit one subject (like repossession, self-defense, citizen's arrest, and other infringements on rights of liberty or property) to rigorous safeguards. Even public commitment in Illinois is private in a sense, because the state requires relatives of voluntarily and involuntarily committed mental patients alike to pay the cost of their upkeep in the state's institutions, and it allows the involuntarily committed to be placed in private homes as well as public and private hospitals. See Ill.Rev.Stat. ch. 91½, §§ 5–105, 5–115, 3–811; *People v. Sharkey*, 60 Ill.App.3d 257, 265, 17 Ill.Dec. 465, 470, 376 N.E.2d 464, 469 (1978). And long before the passage of the 1945 statute, the law of Illinois authorized the confinement of an insane person by private persons, for up to ten days, if he was a danger to himself or others. See *Crawford v. Brown*, 321 Ill. 305, 316, 151 N.E. 911, 915 (1926), interpreting the Act to Revise the Law in Relation to the Commitment and Detention of Lunatics, § 2, 1893 Ill.Laws 141.

Private commitment was not novel in 1893; nor was it invented in Illinois. Ac-

cording to Blackstone, writing in 1765, "On the first attack of lunacy, or other occasional insanity, while there may be hope of a speedy restitution of reason, it is usual to confine the unhappy objects in private custody under the direction of their nearest friends and relations." 1 Commentaries on the Laws of England 305. Histories of the treatment of the insane focus on public institutions, but involuntary extrajudicial commitment to private institutions has long been commonplace. London's notorious lunatic asylum, nicknamed "Bedlam," was originally private; it was representative of private medieval institutions to which the insane were committed to have their demons exorcised. See Albert Deutsch, The Mentally Ill in America 15, 40, 62, 418–24 (2d ed. 1949). "When the early hospitals and asylums for the mentally ill sprang up, commitment could be effected with the greatest of ease.... The pauper and indigent insane might be summarily committed to the poorhouse, prison or hospital by friends or relatives or by order of public officials...." *Id.* at 420. See also 1 The Institutional Care of the Insane in the United States and Canada 81, 313–17 (Hurd ed. 1916); Bell, Treating the Mentally Ill 46–47 (1980).

The reasons for private commitment, as for self-defense, citizen's arrests, and other private remedies, are intensely practical. If a person displays symptoms of acute and violent mental illness, his family or physician—in an appropriate case a passerby or other stranger—may have to act immediately to restrain him from harming himself or others, and there may be no public institution at hand. That is why the Illinois Mental Health Code allows private persons to commit to private (as well as to public) institutions. We do not know the circumstances in which Mr. Spencer was committed, but it appears that the first commitment was because he had tried to commit suicide, and let us assume this was indeed the reason. If his father and Dr. Lee and St. Elizabeth had had to initiate a judicial proceeding before committing him, he might have killed himself before they could obtain the necessary order. When family members commit a person who has just tried to kill himself, they do not, by virtue of this action, become state actors subject to suit under section 1983.

To allow family members, physicians, and other private persons to exercise the commitment power without safeguards, however, including a provision for a hearing eventually—and sooner rather than later—would be monstrous. If Spencer thinks the eight days allowed by Illinois law for confinement prior to hearing is too much, he can challenge the constitutionality of the statute, by analogy to *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed. 2d 556 (1972). He has not done so. Indeed, he relies on the statute to make the defendants state actors. But a private commitment is no more state action than a citizen's arrest, the repossession of chattels, or the ejection of trespassers is. The statutes authorizing or constraining these private activities may or may not be constitutional (*Fuentes*); the activities themselves remain private (*Flagg Brothers*—and see also *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 940, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982); *Winterland Concessions Co. v. Trela,* 735 F.2d 257, 262 (7th Cir.1984); *Loyd v. Loyd,* 731 F.2d 393, 398–99 (7th Cir.1984); *Greco v. Guss,* 775 F.2d 161, 164–67 (7th Cir.1985)). This conclusion has been reached with specific reference to a daughter's use of a civil commitment statute to institutionalize her father so that he would not remarry, the court remarking that "armed with less process than would be necessary to seize a refrigerator, Texas peace officers dragged Dahl from his home and deposited him with Presbyterian Hospital in Dallas." *Dahl v. Akin,* 630 F.2d 277, 279 (5th Cir.1980).

We are given some pause by the allegation in Spencer's complaint of involvement by the local police: specifically that Dr. Lee had given Spencer the injection "After cau[s]ing a psychiactric [sic] emergency by dismissing me from St. Elizabeth Hospital and a false arrest by the Danville Police Department while seeking medical treatment." None of Spencer's numerous subsequent filings mentions the police; nowhere is it suggested that they conspired

with the defendants, and he has named no police officers as defendants. It is possible that the police were called in to assist with one of Spencer's commitments, though this does not seem to be what he is alleging. At all events, police assistance in the lawful exercise of self-help does not create a conspiracy with the private person exercising that self-help. *Lugar v. Edmondson Oil Co., supra,* 457 U.S. at 939 n. 21, 102 S.Ct. at 2755 n. 21; *Gramenos v. Jewel Cos.,* 797 F.2d 432, 435–36 (7th Cir.1986); *Greco v. Guss, supra,* 775 F.2d at 167–68; *Tarkowski v. Robert Bartlett Realty Co.,* 644 F.2d 1204, 1208 (7th Cir.1980). The citizen who makes a citizen's arrest is not transformed into a state actor by handing over the arrested person to the police—indeed, if he fails to do so, the arrest is invalid and he is liable for false imprisonment.

The pressure to transform state common law torts into federal constitutional torts comes from the immunities and the damage ceilings that states frequently impose on suits against their public officials (see, e.g., *Archie v. City of Racine,* 847 F.2d 1211, 1227 (7th Cir.1988) (concurring opinion)), from a sense that state judges are sometimes unsympathetic to suits against the state, and from the availability of attorney's fee awards in civil rights suits under 42 U.S.C. § 1988. Only the last of these considerations is present in a case such as this where the only defendants are private persons (or private institutions) not acting pursuant to formal judicial order. See *Executive Commercial Services, Ltd. v. Daskalakis,* 74 Ill.App.3d 760, 766, 31 Ill.Dec. 58, 62, 393 N.E.2d 1365, 1369 (1979). There is neither practical nor legal basis for this suit.

AFFIRMED.

RIPPLE, Circuit Judge, with whom FLAUM, Circuit Judge, joins, concurring in part and dissenting in part.

Despite the great number of cases and the seemingly well-honed lexicon of "tests," the concept of "state action" remains a difficult one. "[F]ormulating an infallible test," the Supreme Court has said, remains an "impossible task." *Reitman v. Mulkey,* 387 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L.Ed.2d 830 (1967). "While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349–50, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). In words that echo the warning of Justice Clark in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 723, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961), now-Chief Justice Rehnquist has pointedly remarked that "[t]he true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test is met." *Jackson,* 419 U.S. at 351, 95 S.Ct. at 453–454.

Several factors require that, in the case before us, we take special heed of Chief Justice Rehnquist's injunction. As a threshold matter, it bears noting that this case comes before the court on the *pro se* complaint of the patient. We are obliged, therefore, to evaluate the complaint by less stringent standards than formal pleadings drafted by lawyers. *Pryzina v. Ley,* 813 F.2d 821, 822 (7th Cir.1987); *Palmer v. City of Decatur,* 814 F.2d 426, 428 (7th Cir.1987). More fundamentally, this is an involuntary commitment case. As the pronouncements of the Supreme Court make obvious, such commitments present an extraordinary possibility of abuse to individual liberty. *See Addington v. Texas,* 441 U.S. 418, 425–27, 99 S.Ct. 1804, 1809–10, 60 L.Ed.2d 323 (1979) (discussing state interests sufficient to justify involuntary civil commitment); *O'Connor v. Donaldson,* 422 U.S. 563, 573–76, 95 S.Ct. 2486, 2492–94, 45 L.Ed.2d 396 (1975) (discussing criteria for involuntary civil commitment). In this respect, the Supreme Court's cases mirror the harsh lessons of this century. Civil commitment has served many a perverse end in other countries of the world; we have learned, hopefully, not to permit the slightest movement in that direction

here. Lastly, we must recognize—and respect—the efforts of the state of Illinois to prevent abuses in this delicate area. The historical experience of England or even early America are of little value when a state has acted affirmatively to prevent from occurring incrementally here the sort of abuse we have seen in other parts of the world.

The Illinois statutory scheme must be the starting point of our analysis. Under the Illinois scheme, there are four separate steps involved in the involuntary commitment of a patient to a private institution:

1) the decision of the patient's family and its physician that commitment is required and that action must be taken to institutionalize the patient;

2) the decision of a licensed physician that the available information justifies immediate commitment;

3) the involuntary institutionalization of the patient pursuant to the physician's certification;

4) the day-to-day care of the patient, once institutionalized, by the private institution.

Step 1 and step 4 of this process are, under the prevailing case law, private action rather than state action. With respect to step 1, the simple invocation of state legal procedures, standing alone, does not constitute joint participation or conspiracy with state officials. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 n. 21, 102 S.Ct. 2744, 2755 n. 21, 73 L.Ed.2d 482 (1982). Therefore, even on the basis of this rambling *pro se* complaint, we can conclude that the decision of the family and the physician to seek involuntary commitment is not action attributable to the state. The state neither commands nor encourages such private initiative. *See Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). The state merely provides an opportunity for these private parties to seek relief through the judicial process. "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment."

*Blum*, 457 U.S. at 1004–05, 102 S.Ct. at 2786. Indeed, as will be discussed below, the family's decision is subject to significant scrutiny by the state.

Step 4 in the process is also private rather than state action. While a good deal of the care of persons afflicted with mental disease has been and is provided by the state, it cannot be said that this task is one "traditionally exclusively reserved to the State." *Jackson*, 419 U.S. at 352, 95 S.Ct. at 454. *See also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978). "The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Jackson*, 419 U.S. at 350, 95 S.Ct. at 453. While there may indeed be instances when a different result would be necessitated because the state commanded or encouraged a particular treatment, no such situation is set forth in this complaint even when the document is read according to the lenient standards applicable to the evaluation of *pro se* complaints. Nor can we presume that affirmative direction by the state is present.

> The Mental Health Code provides for an individualized medical treatment plan that is designed solely by the recipient, his relatives, and his physician. (Ill.Rev. Stat.1985, ch. 91½, pars. 2–102(a), 2–107.) The statute does not give the court a place in the treatment process except to review the plan periodically and to monitor the recipient's progress. (Ill.Rev. Stat.1985, ch. 91½, par. 3–814.)

*Illinois v. Orr*, 176 Ill.App.3d 498, 125 Ill. Dec. 885, 531 N.E.2d 64 (1988).

Steps 2 and 3 of the Illinois procedure are far more problematic. With respect to step 2, the physician's certification required before an involuntary commitment may take place is part of a comprehensive adjudicative scheme mandated by state law to ensure that the patient is not deprived of his liberty unless the statutory criteria for involuntary commitment are met. *See Olsen v. Karwoski*, 68 Ill.App.3d 1031, 25 Ill.Dec. 173, 179, 386 N.E.2d 444, 450 (1979). If, as is the case in some states,

the physician's certificate were simply informational and designed to assist a tribunal or other decision-maker, it would be difficult to characterize the execution of the certificate as "state action." *See Hall v. Quillen,* 631 F.2d 1154, 1155 (4th Cir. 1980), *cert. denied,* 454 U.S. 1141, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982) (physician appointed by court to render professional evaluation in voluntary commitment proceeding not a state actor).[1] However, this hypothetical situation "contrasts with the procedure in Illinois for emergency admission, where a physician's medical certificate does not receive the attention of a judge until after the patient already has been admitted to the hospital." *Olsen,* 25 Ill. Dec. at 179, 386 N.E.2d at 450. Here, the physician's certification is the initial assertion of the state's authority to commit the patient involuntarily. It is a decision, not an opinion. The physician acts not as a private person but as the state's decision-maker. By virtue of the authority delegated to him by the state, the physician may authorize what no other private person can authorize, the involuntary commitment of the patient to an institution. "[A] state may delegate authority to a private party and thereby make that party a state actor." *NCAA v. Tarkanian,* — U.S. —, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988); *see also West v. Atkins,* — U.S. —, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

The physician's certification, as the Illinois courts have recognized, *see id.,* is hardly private action in which the state simply acquiesces, such as the exercise of

self-defense, the eviction of trespassers, or the repossession of chattels. Nor can the physician's act be considered a citizen's arrest. In such a situation, the arrest results from purely private initiative without any "prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." *Carey v. Continental Airlines, Inc.,* 823 F.2d 1402, 1404 (10th Cir.1987). Here, by contrast, the physician acts under the direct statutory authorization of the state to perform a specific act that is part of a broader state adjudication procedure in an area where the state has assumed express responsibility for the ultimate decision.

Step 3, a health care institution's accepting a patient and keeping that patient against his will, also involves, under the Illinois scheme, the assertion of state authority and therefore must be considered state action. The *care* of mentally ill persons is not a matter entrusted traditionally to the exclusive control of the state. The state has controlled, however, the exclusive authority to determine when a person may be held against his will and Illinois has most certainly asserted that authority. *See Cowdery v. Northern Trust Co.,* 321 Ill.App. 243, 53 N.E.2d 43, 49 (1944). When a private health care institution in Illinois holds a patient against his will pursuant to a physician's certification, its custodial duties are by direction of the state's judicial process. Indeed, it is quite clear that the police power of the state will enforce

---

1. The majority cites *Hall v. Quillen,* 631 F.2d 1154 (4th Cir.1980), *cert. denied,* 454 U.S. 1141, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982), for a far broader proposition than its actual holding. It deals with whether a physician who examines a patient as part of a judicial proceeding for commitment is a state actor. In *Hall,* the physician was appointed by the judge to examine the patient and to render a professional opinion with respect to his condition. This is a very different situation from the one before us. In our case, the physician is the decision-maker and has the authority to commit the person for a specified period of time without any further judicial approvals.

    The cases cited in *Hall* are also distinguishable. For instance, in *Jackson v. Salon,* 614

F.2d 15 (1st Cir.1980), the First Circuit held that a court-appointed attorney was not a state actor. This situation of course is quite different from the situation presented in our case. The same is true of the Second Circuit opinion in *Housand v. Heiman,* 594 F.2d 923 (2d Cir.1979). *United States ex rel. Simmons v. Zibilich,* 542 F.2d 259 (5th Cir.1976), also involves a court-appointed attorney. *See also Harkins v. Eldredge,* 505 F.2d 802 (8th Cir.1974). *Espinoza v. Rogers,* 470 F.2d 1174 (10th Cir.1972), is also a case involving the actions of a state public defender. *Szijarto v. Legeman,* 466 F.2d 864 (9th Cir.1972), also involves an attorney. In this case it was a retained attorney. The same is true of *Thomas v. Howard,* 455 F.2d 228 (3d Cir.1972) and *Mulligan v. Schlachter,* 389 F.2d 231 (6th Cir.1968).

that custody if necessary.[2] *Cf. Estate of Johnson v. Condell Memorial Hosp.*, 119 Ill.2d 496, 117 Ill.Dec. 47, 53, 520 N.E.2d 37, 43 (1988) ("If Holt had been admitted to Condell as an involuntary admittee, the facility would have been authorized by the Code to request the police to apprehend her....").

As the majority opinion notes, at 1378, if the state decided to contract out the provision of state highway police or the administration of state prisons to private entrepreneurs, they would well be considered state actors. Similarly, in this case, the state has in effect delegated the task of enforcing a state-ordered commitment to a private health care facility. Without that authority, the institution would be unable to perform its custodial function. Therefore, its action is fairly attributable to the state. *See Burch v. Apalachee Community Mental Health Serv.*, 840 F.2d 797, 803 (11th Cir.1988). "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941).

In applying the foregoing analysis, I conclude that the complaint was improperly dismissed in its entirety. Mr. Spencer's allegations with respect to steps 1 and 4 of the commitment process cannot sustain a cause of action under section 1983. With respect to step 2, he has failed to join as a party the physician who signed the certificate. It is not necessary therefore to address the important question of whether that physician would, in any event, enjoy immunity from suit. *See generally*, Annotation, *Right to Relief Under Federal Civil Rights Act of 1871 (42 U.S.C.S. § 1983) for Alleged Wrongful Commitment to or Confinement in Mental Hospital*, 16 A.L.R. Fed. 440, 450–63 (1973).

Step 3 presents a much more difficult question. It is not at all clear that the complaint and the accompanying papers state an allegation that the health care facility wrongfully held Mr. Spencer against his will. However, we are required to read a *pro se* complaint charitably and that requirement ought to be applied scrupulously when we are dealing with the workproduct of an individual with a history of mental health problems. While pleadings from such individuals present a good deal of extraneous material, their authors are particularly incapable of making a coherent presentation. It is our job to ensure that their rights are protected even at the cost of some judicial efficiency. Consequently, I would reverse the judgment of the district court and remand the case for further proceedings with respect to this aspect of the case.

CUMMINGS, Circuit Judge, with whom CUDAHY, Circuit Judge, joins, dissenting.

Disagreeing with the majority's conclusion that the actions of the defendants in committing Spencer to St. Elizabeth Hospital necessarily cannot constitute state action, I respectfully dissent from the majority's holding. In order to determine whether the defendants' roles in the involuntary commitment of the plaintiff qualify as state action such that the defendants may be subject to liability under 42 U.S.C. § 1983, it is necessary to elaborate on the majority's discussion of the statutory authority for defendants' conduct.

Involuntary commitment to a mental health institution may be commenced against an individual who, as a result of mental illness, is reasonably expected to inflict serious physical harm upon himself or another in the near future or is unable

---

**2.** In *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344 (7th Cir.1986), the court held that a private person became a state actor for purposes of the state action requirement when they repossessed collateral on the strength of an ex parte order issued by a court. The ex parte order instructed the sheriff to assist the private person if need be to carry out the order. In this case it was not necessary to call the sheriff. The court held that "[t]he fact that the sheriff remained in the background and hence could not be joined as a defendant does not deprive Carpenter Cook's action in enforcing a judicial order of its character as state action." *Id.* at 1346.

to provide for his own physical needs. Ill. Rev.Stat. ch. 91½, § 3–601(a) (Smith–Hurd 1988). The commitment proceedings may be ·initiated by any private individual, 18 years or older (such as friends or relatives), public officials (such as the police who have had an opportunity to observe the individual), hospital staff, or court order. Sections 3–601, 3–606, 3–607. However, none of those parties may detain a patient at a mental health institution for more than twenty-four hours without completing a petition detailing the petitioner's basis for recommending commitment of the individual and obtaining a certificate executed by a "physician, qualified examiner, or clinical psychologist" who has examined the patient 72 hours prior to admission, stating that the respondent is subject to involuntary admission and requires immediate hospitalization. Sections 3–603, 3–604.

Upon presentation of the petition and physician's certificate to the county sheriff, the patient is taken into custody and transported to a mental health facility. Section 3–605. A peace officer may take custody of a patient for purposes of involuntary commitment without a physician's certificate if the officer personally observes a person who appears to be subject to involuntary commitment and completes the necessary petition upon arriving at the facility. Section 3–606. Similarly, a court may order a person to be taken into custody and transported to a mental health facility if as a result of observation in open court the person appears to require emergency commitment. Section 3–607. No private citizen may cause a law enforcement agency to take custody of the patient without the physician's certificate. However, any of the enumerated individuals may cause a person to be detained for examination only at a mental health facility for a maximum of twenty-four hours without a physician's certificate if "no physician, qualified examiner, or clinical psychologist is immediately available or it is not possible after a diligent effort to obtain the certificate." Section 3–603. Presumably, without a physician's certificate necessary to invoke the force of the police under Section 3–605 of the statute, a private individual must be capable of personally transporting the patient to the mental health facility. If the patient has been detained at the mental health facility on the basis of a petition alone under Section 3–603, the facility may complete the necessary medical certificate.

Within twenty-four hours of admission (exclusive of weekends and holidays), the patient must be examined by a psychiatrist, other than the individual who completed the physician's certificate. The results will determine whether the patient should be dismissed or whether a judicial hearing should be scheduled within five days of admission. Section 3–610. Treatment may begin on the involuntarily admitted patient upon completion of the physician's certificate, although the patient may refuse medication unless such medication is "necessary to prevent the [patient] from causing serious harm to himself or others." Section 3–608. The patient may not be involuntarily treated in any event until a physician's certificate has been completed. The patient may be held at the facility under the authority of a physician's certificate and petition for a maximum of eight days prior to a hearing.

In reviewing the district court's dismissal of plaintiff's action, the truth of all well-pleaded allegations must be assumed and viewed in the light most favorable to Spencer. *Vaden v. Village of Maywood,* 809 F.2d 361, 363 (7th Cir.1987), certiorari denied, —— U.S. ——, 107 S.Ct. 2489, 96 L.Ed.2d 381. Further, this Court must liberally construe Spencer's *pro se* complaint and affirm its dismissal only if he can prove no set of facts entitling him to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

In order to state an action under Section 1983, the plaintiff must allege that the defendant deprived him of a right secured by the Constitution or laws of the United States and that the defendant acted under "color of state law." *Lugar v. Edmondson Oil Co.,* 457 U.S. at 923, 937–939, 102 S.Ct. at 2746, 2753–2755. The inquiry as to whether a private person's actions are performed "under color of state

law" is identical to the "state action" determination required for a violation under the Fourteenth Amendment. *Lugar* at 928–935, 102 S.Ct. at 2749–2752.

Spencer has clearly articulated a sufficient liberty interest in his allegations of involuntary commitment and treatment during his detention at St. Elizabeth Hospital. See *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *Youngberg v. Romeo*, 457 U.S. 307, 315–316, 102 S.Ct. 2452, 2457–2458, 73 L.Ed.2d 28 (1982). The only issue remaining is whether the actions of Dr. Lee and St. Elizabeth Hospital implicate state action.[1]

## I. *INVOLUNTARY COMMITMENT*

### A. *Function of the State*

The involuntary commitment of an individual believed to be a danger to himself or others without a judicial hearing is no doubt one of the most severe infringements of personal liberty. However, the state has power to cause such a deprivation acting pursuant to its *parens patriae* power to protect and provide care for the mentally ill. *Addington v. Texas*, 441 U.S. at 426, 99 S.Ct. at 1809. Although neither Dr. Lee nor St. Elizabeth Hospital is a state employee, the state action component may be fulfilled if their actions may be "fairly attributable to the state." *Lugar*, 457 U.S. at 939, 102 S.Ct. at 2755. The test of "fair attribution" involves two elements where a private party is alleged to be a state actor:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person

who may fairly be said to be a state actor.

*Lugar* at 937, 102 S.Ct. at 2753–2754. The Supreme Court explained further that mere action by a private party pursuant to a statute without "something more" will not transform the private party into a state actor. The "something more" necessary to convert the private activity into state action varies with the factual circumstances, resulting in correspondingly varied tests: the "public function" test, the "state compulsion" test, the "nexus" test, and the "joint action" test. *Lugar* at 939, 102 S.Ct. at 2754–2755.

In *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, the Court further elaborated that state action may be found in the conduct of a private entity when one of three elements is present:

> '[T]here is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.' ... [The State] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State ... The private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'

*Blum* at 1004–1005, 102 S.Ct. at 2786 (citations omitted).

Unlike the majority, I do not think *Byrne v. Kysar*, 347 F.2d 734 (7th Cir.1965), controls this case. Spencer was committed under the emergency involuntary commitment procedures contained in Section 3–600 *et seq.* while the plaintiff in *Byrne* was committed pursuant to court order, now Section 3–700 *et seq.* The physician in

---

1. Counsel for Dr. Lee assert in their Supplemental Brief that Dr. Lee did not sign the physician's certificate used for Spencer's involuntary commitment (Supp. Br. at 5). This statement is supported by Spencer's 1984 medical records attached to his more definite statement submitted to the district court on November 19, 1987. However, Spencer alleges that Dr. Lee was involved in his involuntary commitment in both 1982 and 1984 (Pl. Br. at 3). Spencer's 1982 medical records were not submitted to the district court prior to this appeal. It is premature to resolve this factual dispute pursuant to a motion to dismiss. *Mitchell v. Archibald & Kendall, Inc.*, 573 F.2d 429, 432 (7th Cir.1978). The determination of Dr. Lee's role in the 1982 commitment of Spencer is a factual issue properly postponed until trial. In addition to his role in Spencer's commitment, Dr. Lee remains potentially liable under Section 1983 for the treatment of Spencer in 1982 and 1984.

*Byrne* merely provided the certificate to fulfill the medical witness requirement for the execution of a petition to initiate a judicial inquiry into the mental health of the plaintiff. *Byrne* at 736.

The distinction is significant because unlike Dr. Lee, the physician in *Byrne* was no more than an expert witness in the adjudication of the plaintiff for involuntary commitment. The certificate executed by the physician in *Byrne* was insufficient to cause the detention of the patient for up to eight days prior to a hearing. The authority to deprive the patient of his liberty rests in the court under the statute in *Byrne* whereas the private physician possesses that authority in the emergency commitment procedure. Since the physician's action in *Byrne* is insufficient to commit and treat a patient on an emergency basis, the physician is not a state actor. Similar conclusions have been reached by other courts construing statutes which give physicians authority to execute an application which initiates the judicial machinery for committing a patient. *See, e.g., Willacy v. Lewis,* 598 F.Supp. 346, 348 (D.D.C.1984), and cases cited therein.

In reaching its conclusion that the physician's participation in the emergency commitment procedure does not constitute state action, the majority applies the public function test from *Flagg Bros. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, to determine whether the involuntary commitment of patients is a traditional, exclusively sovereign function which has merely been delegated to a private actor. If such a delegation has been made, the state cannot escape responsibility for constitutional deprivations caused by private parties acting under the delegation. *West v. Atkins,* — U.S. —, 108 S.Ct. 2250, 2259, 101 L.Ed.2d 40 (1988).

As support for its decision, the majority traces the historical roots of involuntary commitment, concluding that since the commitment of the mentally ill has never been the exclusive prerogative or traditional function of the state, it is not state action when performed by a private entity. However interesting this history lesson may be, the more relevant question for determining whether state action exists is not whether private citizens were capable of unilaterally committing the mentally ill in the days when Bedlam existed in England, but whether under the present law private citizens are capable of depriving individuals of their liberty to the same extent as may the state or whether the state has a superior, unique authority to deprive individuals of liberty in this manner, an authority not inured in the general citizenry. Indeed, as the majority readily concedes, every public function has an analogous private function in history. The majority's opinion, nonetheless, assumes as a premise of its argument that what constitutes a public function is relatively stagnant over time. It may have been the case that in the time of Bedlam the rights of the mentally ill were not recognized and protected to the same extent they are today, as were the rights of minorities prior to the Thirteenth and Fourteenth Amendments. Illinois has altered the course of history by affirmatively recognizing the rights of the mentally ill through its enactment of Chapter II of the Illinois Mental Health and Developmental Disabilities Code.

The majority finds further support for its conclusion that confinement of the mentally ill does not constitute state action by analogy to citizen's arrest. The argument is that since citizens are capable of depriving individuals of personal liberty when they have a reasonable belief that an offense is being committed without becoming state actors, then the deprivation of liberty is not an exclusive state function. The analogy is faulty. Although the citizen may use reasonable force to prevent the commission of an offense, the citizen's right to make an arrest, now codified in Ill.Rev.Stat. ch. 38, § 107–3, is not coextensive with that of the state. The citizen's role in such an arrest involves that minimal amount of restraint on the suspect's liberty necessary to prevent the commission of an offense or escape of an offender. The line is one of degree. A citizen performing an arrest may only detain a suspect until law enforcement agents are available, while a physician may detain and treat an involun-

tarily committed patient for up to eight days without a hearing.

The analogy to citizen's arrest is further inappropriate because prior to taking a suspect into custody based on the citizen's complaint, a police officer must make an independent determination of reasonable grounds to believe the suspect has committed or is committing an offense. A private citizen could not cause an individual to be confined for up to eight days, as may a physician pursuant to Illinois law, unless the police had also found reasonable grounds for the arrest and detention of the individual. Ill.Rev.Stat. ch. 38, § 107–2(c). Under the mental health code, the sheriff is under a duty to take custody of and transport the patient based solely upon presentation of the petition and certificate, obviating the need for an independent determination of mental illness by the sheriff. The information provided by the citizen making or directing the arrest will often form a portion of the basis of the police officer's reasonable grounds determination. However, were the police officer to arrest a suspect solely on the word of the citizen without making a determination of credibility sufficient to satisfy the officer's reasonable grounds requirement, the officer would no doubt be guilty of false arrest and the citizen of false imprisonment.

In *Smith v. Brookshire Bros., Inc.*, 519 F.2d 93 (5th Cir.1975), certiorari denied, 424 U.S. 915, 96 S.Ct. 1115, 47 L.Ed.2d 320 (1976), the failure by the police to establish independently that probable cause existed to detain a suspected shoplifter, relying solely on the conclusory statements of the store employees, resulted in a finding that the store employees were state actors due to the existence of an implicit agreement with the police to arrest solely on the basis of the merchant's information. "An arrest by an officer caused or procured by a private person is the same as an arrest by the private person.... Where the arresting officer relies solely on the information which the defendant's employee gave him in making the arrest, the private party defendant may be held liable for false imprisonment." *Dutton v. Roo–Mac, Inc.*, 100 Ill.App.3d 116, 55 Ill.Dec. 458, 426 N.E.

2d 604 (1981). Likewise in *Lugar*, a private citizen was found to be a state actor where, pursuant to state statute, sheriffs attached property on the *ex parte* application of a private party.

The examples of citizen's arrest and other self-help remedies referred to by the majority are also distinguishable on the basis of the interest that these remedies serve. Whereas the physician acts in the interest of the public in executing a certificate authorizing emergency commitment, self-help remedies fulfill the private property interest of the individual. As Judge Gesell reasoned in addressing the question of whether state action existed in the physician's detention and application for admission of the allegedly mentally ill plaintiff: "A physician who detains an individual 'likely to injure himself or others' ..., by contrast, is not simply availing himself of a 'self-help' remedy with the acquiescence of the state; instead, the function he performs is more akin to the state's power and duty to protect against threats to the general public and to care for those unable to care for themselves." *Willacy v. Lewis* at 349.

It is clear from the statutory framework that no private individual may commit a patient to a mental health institution for treatment on an emergency basis without a prior determination by a qualified physician or mental health facility that the patient warrants confinement. In the commitment procedure, the physician's certificate serves a quasi-judicial function correlative to an arrest warrant issued by a judge authorizing the seizure of a suspect. This Court recognized the nature of the physician's function in the commitment process in *Byrne*, 347 F.2d at 736, where doctors, who were members of a court-appointed committee, were held to have performed a quasi-judicial function in examining and recommending commitment of the patient. Under the Illinois mental health code, the state has delegated its adjudicatory determination in the emergency context to the physician, empowering the physician to use the force of state law enforcement agencies to confine any individual the physician

determines to be in need of emergency commitment.

This reasoning was used in *Burch v. Apalachee Community Mental Health Services, Inc.*, 840 F.2d 797 (11th Cir.1988) (*en banc*). In *Burch*, the plaintiff alleged that a concerned citizen found the plaintiff wandering on the side of the highway and took him to a private community mental health facility designated by Florida as capable of receiving patients suffering from mental illness. While in a psychotic state, at the request of the private facility, Burch signed a form for voluntary admission and treatment. After a stay of three days, the private facility transferred him for further treatment to Florida State Hospital. Throughout his 152 days at the private facility and the hospital, the plaintiff was never accorded a hearing at which to challenge his commitment in violation of Florida law requiring the release, commencement of involuntary commitment procedures, or the voluntary express, informed consent of the patient to evaluation or treatment. Since Burch was under the influence of psychotropic drugs when his signature for commitment was procured, his consent was neither voluntary nor informed as required under the statute. After concluding that the plaintiff's complaint alleged a deprivation of liberty without due process of law, the court applied the *Lugar* test to determine the state action requirement of Section 1983. Writing for the plurality, Judge Frank Johnson explained that the hospitals' actions constituted state action because "[t]he appellees deprived Burch of his liberty in a way not available to a private citizen." *Burch* at 803. In concurring with Judge Johnson's opinion, Judge Clark further stated that the two hospitals' "deprivation of Burch's freedom was authorized and done in the course of their employment as mental health professionals acting under color of and pursuant to Florida law. Their responsibility and consequent liability under § 1983 is no different from that of police officers who search a citizen's home, arrest the citizen and detain him at the jail, all without a warrant or proceeding before a magistrate." *Burch* at 805, n. 2.

Recognizing that the plaintiff in *Burch* was detained by the two defendant hospitals for a much greater amount of time than was Spencer, the reasoning of *Burch* nonetheless applies with equal force to this case. Just as in *Burch* no private citizen could detain an individual in a mental health institution for 152 days, similarly no citizen can commit an individual in Illinois for eight days without a hearing. In both cases, only the physicians and hospitals were capable of depriving the plaintiffs of their liberty for the respective amounts of time.

Two district courts have reached the same conclusion construing similar statutes. In *Plain v. Flicker*, 645 F.Supp. 898 (D.N.J.1986), the court, criticizing the "rudimentary analysis" of this Court in *Byrne*, found state action in the conduct of two physicians who certified the emergency involuntary commitment of the plaintiff for twenty days prior to a hearing. An emergency involuntary commitment is appropriate under New Jersey law "where the condition of the patient, in the judgment of the certifying physicians, is such that the patient should be placed under immediate restraint and confinement in an institution, and where it is impossible to obtain an order of temporary commitment." N.J. S.A. 30:4–38. The New Jersey emergency commitment statute required the signatures of two physicians "of reputable character" qualified as "practicing physicians" in order to commit an individual. N.J.S.A. 30:4–29. The presentation of the certificates and complaint to the chief executive of the mental health institution by the person seeking the involuntary commitment became sufficient to detain the patient for up to twenty days without a hearing. N.J. S.A. 30:4–38.

The court held that the physicians' participation in the involuntary commitment procedure constituted state action because the physicians were performing a public function. "The state could have developed its statutory scheme to require state public health doctors or state hospital physicians to make competence determinations, just as state actors are required to determine the

need of quarantine. Instead it has delegated to physicians its police power to certify institutionalization for up to 20 days whether the physicians are in private practice or are public employees." *Plain* at 908.

A similar conclusion was reached by the court in *Davenport v. Saint Mary Hospital,* 633 F.Supp. 1228 (E.D.Pa.1986). The statute in question allowed a physician to detain a patient involuntarily for up to 120 hours if the physician determined that the patient was severely mentally disabled and in need of emergency treatment. Pa.Stat. Ann. tit. 50, § 7302(b), (d) (Purdon 1985). The court found that the involvement of the physicians and hospitals in the commitment procedure implicated state action. "In contrast to the lack of state involvement in a private individual's decision to utilize state law to resolve a private dispute, ... Pennsylvania's delegation of authority to the hospital defendants, if established, potentially implicates the state in their decisions. Courts have held that when the state gives a select individual or group powers that are traditionally exercised by the state and not possessed by the general citizenry, a person exercising these powers is 'clothed with the authority of state law,' ... and may therefore be deemed a state actor." *Davenport* at 1237 (citations omitted). In contrast to the majority in this case, the district court in *Davenport* did not find that the citizenry possesses the same authority to commit involuntarily an individual as does the state.

Spencer does not, however, argue that a private person becomes a state actor by completing a petition setting forth the reasons for believing an individual is in need of involuntary treatment as part of the requisite commitment documents. Neither the private person performing a citizen's arrest nor a private person completing the petition for commitment is acting on behalf of the state. In contrast, the physician who completes the certificate which triggers the involuntary commitment procedure makes a determination similar to that of a police officer who must find reasonable grounds to believe an offense has been committed in order to keep a suspect in custody after a citizen transports the suspect to the law enforcement agency, or requests that a policeman take custody of the suspect. Both the physician and the police represent the state in making the essential respective factual determinations that the individual should be deprived of his personal liberty interest pending a judicial hearing.

### B. *Participation of State Officials*

In addition to the *Flagg Bros.* test which focuses on the nature of the service purported to be traditionally a state function, state action may be found where private persons engage in joint activity with state officials. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). "Conspiracy" with a private actor may transform such purely private activity into state action through the participation of the state officials using the authority they possess by virtue of the state.

The majority's example of citizen's arrest may even become subject to challenge as state action under Section 1983 when two factors are present: (1) In detaining the suspect, the citizen acts in accordance with a preexisting plan between the citizen and police; and (2) that plan's content must involve the citizen's exercise of functions exclusively reserved to the state. *Klimzak v. City of Chicago,* 539 F.Supp. 221 (N.D. Ill.1982). Accordingly, where police routinely arrested suspected shoplifters based solely on a shopkeeper's statement without independent investigation, the involvement of the police was sufficient to transform the merchant into a state actor for purposes of Section 1983. *Smith v. Brookshire Bros., Inc.,* 519 F.2d 93 (5th Cir.1975).

In his *pro se* complaint, as indicated by the majority opinion, Spencer does not specifically allege a "conspiracy" with police officers in his emergency involuntary commitment at St. Elizabeth Hospital. Indeed, it would be surprising if a *pro se* plaintiff with a history of mental illness had sufficient working knowledge of the law to plead the legal phrases which compose the elements of a Section 1983 action. The

Court should not penalize Spencer for his inartfully pleaded complaints and subsequent motions. Nonetheless, the majority summarily disposes of this claim due to Spencer's inability to name police officers as defendants or mention the involvement of the police with sufficient frequency. Given the Court's obligation to construe Spencer's complaint liberally and dismiss the complaint only if he can prove no set of facts which would entitle him to relief, Spencer has sufficiently alleged the involvement of the Danville Police Department to sustain defendants' motion to dismiss.

Spencer initially implicates the involvement of the Danville Police in his complaint in which he alleged the "false arrest by the Danville Police Department." In his motion for an injunction, Spencer again alleges an "arrest while seeking admission." Spencer also refers to an arrest in his more definite and complete statement ordered by the district court. Finally, the medical records attached to Spencer's more definite statement which were completed by Dr. Lee and other members of the St. Elizabeth staff indicate that Spencer was brought to the hospital by the police.

As the majority correctly notes, the mere invocation of statutory remedies does not of itself transform private activity into state action. See, e.g., Earnest v. Lowentritt, 690 F.2d 1198 (5th Cir.1982) (no state action was found by individual invoking mortgage foreclosure law without state official being involved). However, Spencer's allegations of the involvement of the police in his commitment are no different than those in Lugar where the sheriff assisted the plaintiff in attaching property. Similarly, in Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc., 795 F.2d 1344 (7th Cir.1986), the mere presence of a sheriff while private parties executed an ex parte order of attachment was sufficient to transform the private parties into "deputy sheriffs pro tem." Del's Big Saver at 1346. The fact that the order to repossess collateral was executed by the private parties without calling on the sheriff did not distinguish the case from Lugar. Likewise, the mere presence of the police while Spencer was detained at St. Elizabeth Hospital is sufficient participation to constitute state action.

## II. TREATMENT

Spencer alleges that the mistreatment he received from defendants during his emergency commitment amounted to a deprivation of his liberty interest without due process of law. As noted earlier, the Supreme Court has recognized the rights of mentally retarded patients committed involuntarily in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452. In Youngberg, a mentally retarded respondent was involuntarily committed to a Pennsylvania state institution. As a result of the mistreatment he received, his mother filed an action on his behalf under Section 1983 naming the institution as defendant. The Court determined that the respondent was entitled to "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by those interests." 457 U.S. at 324, 102 S.Ct. at 2462. In his concurrence, Justice Blackmun notes a distinction between "care" and "treatment," leaving open the question whether treatment alone raises the same due process concerns. Youngberg at 318 and n. 23, 102 S.Ct. at 2459 and n. 23 (Blackmun, J., concurring).

Spencer raises similar claims of mistreatment during the period of his involuntary commitment at St. Elizabeth Hospital. However, unlike Romeo, Spencer was treated at a private facility. Illinois does not distinguish between the two types of facilities in recognizing its responsibility to care for the mentally disabled by regulating both public and private hospitals. The Mental Health Code guarantees that:

A recipient of services shall be provided with adequate and humane care and services in the least restrictive environment, pursuant to an individual services plan, which shall be formulated and periodically reviewed with the participation of the recipient to the extent feasible and, where appropriate, such recipient's nearest of kin or guardian.

Ill.Rev.Stat. ch. 91½, § 2–102(a) (Smith–Hurd 1988). This special care takes place at a supervised "mental health facility," which:

> means any licensed *private* hospital, institution, or facility or section thereof, and any facility, or section thereof, operated by the State or a political subdivision thereof for the treatment of persons who are mentally ill and includes *all* hospitals, institutions, clinics, evaluation facilities, and mental health centers which provide treatment for such persons.

Ill.Rev.Stat. ch. 91½, § 1–114 (Smith–Hurd 1988) (emphasis added). The extent of the state's regulation may be illustrated through the statutory rules governing the care and treatment of mentally ill in both public and private institutions. *See, e.g.,* Ill.Rev.Stat. ch. 91½, § 2–107 (right to refuse medication); Ill.Rev.Stat. ch. 91½, § 2–108 (use of restraints); Ill.Rev.Stat. ch. 91½, § 2–109 (use of seclusion); Ill.Rev. Stat. ch. 91½, § 2–110 (use of electro-convulsion therapy or psychosurgery); Ill.Rev. Stat. ch. 91½, § 2–111 (determination of when medical or dental emergency exists so that patient's consent is not required).

Illinois has enacted the above regulations to cover private mental health care facilities. By accepting the state's delegated custodial responsibility to care for mentally ill persons such as Spencer, St. Elizabeth Hospital must not be allowed to absolve itself of these responsibilities by claiming that as a private entity it is not liable for any constitutional deprivation caused by its policies in dealing with patients.

The majority summarily dispenses with Spencer's claim that the treatment he received during his emergency involuntary commitment at St. Elizabeth Hospital constitutes state action for purposes of his Section 1983 claim, reasoning that the treatment of the ill is generally not an exclusive state function even when the state chooses to fund such care. While this proposition is indeed correct, Spencer's treatment is distinguishable from the treatment provided to other ill persons. Spencer's treatments with prolixin injections, allegedly resulting in his suffering incapacitating alkathesia, were forcibly administered during his involuntary commitment at St. Elizabeth Hospital. His involuntary commitment and subsequent treatment were procured by Dr. Lee pursuant to the authority delegated to him by the state under the mental health code. The treatment of Spencer by Dr. Lee and St. Elizabeth Hospital constitutes state action under both the "public function" and "nexus" tests.

In the case of *Milonas v. Williams,* 691 F.2d 931 (10th Cir.1982), certiorari denied, 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947, the court concluded that the treatment by a private school of children with behavioral problems constituted conduct under color of state law. In *Milonas,* many of the students had been involuntarily assigned by the state courts or agencies to the defendant private school for treatment and education. The school was funded in part by the federal and state governments and subject to significant state regulation. The Court concluded that "there was a sufficiently close nexus between the states sending boys to the school and the conduct of the school authorities so as to support a claim under Section 1983." *Milonas* at 940. The court distinguished *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, relied on here by the majority, as holding that the actions of the defendant school in making personnel decisions, as opposed to treatment of its students, cannot be attributed to the state. *Milonas* at 940. The *Milonas* court reasoned that a personnel decision by a state-funded and state-regulated school may not constitute state action because it is not sufficiently interrelated with the state-regulated subject matter—education of maladjusted students. However, the treatment of students was sufficiently related to the function of the school to attribute the school's treatment of the students to the state. Similarly, the involuntary commitment of Spencer by the state and the significant regulation of St. Elizabeth Hospital form a sufficiently close nexus with the state to constitute state action.

In *Ruffler v. Phelps Memorial Hospital,* 453 F.Supp. 1062 (S.D.N.Y.1978), the court held that the treatment of the mentally ill by a private hospital is a delegated state function, relying on the extensive regulation of mental health care providers and the explicit statutory assumption by the state of responsibility for the mentally incompetent. Quoting the Supreme Court from *O'Connor v. Donaldson,* 422 U.S. 563, 582–583, 95 S.Ct. 2486, 2496–2498, the *Ruffler* court emphasized the historical tradition of state involvement with involuntary civil commitment:

> There can be little doubt that in the exercise of its police power a State may confine individuals solely to protect society ... Additionally, the States are vested with the historic *parens patriae* power, including the duty to protect "persons under legal disabilities to act for themselves." ... The classic example of this role is when a State undertakes to act as " 'the general guardian of all infants, idiots, and lunatics.' " (Burger, Ch. J., concurring) (citations omitted).

*Ruffler* at 1070.

In *Fialkowski v. Greenwich Home for Children, Inc.,* 683 F.Supp. 103 (E.D.Pa. 1987), the court found the treatment by a private hospital of a mentally retarded patient to constitute state action in spite of the fact that the patient sought admission voluntarily. "[W]hen a state takes on the responsibility to care for its retarded citizens by institutionalizing them, it assumes an affirmative duty, imposed by the due process clause of the fourteenth amendment, for the individuals' care and well-being. This includes the duty to provide reasonable care and safe surroundings and conditions. Where the state chooses to delegate these responsibilities, and an institution or other private entity chooses to assume them, neither the state nor the private entity may assert that the entity's acts and omissions do not occur under color of state law." *Fialkowski* at 105 (citations omitted). Similarly, Spencer's treatment by St. Elizabeth Hospital performing the state's function in caring for the mentally ill sufficiently implicates state action.

In my opinion, the judgment should be reversed and the cause remanded for further proceedings.